David Ronald CHANDLER, Petitioner-Appellant,

v.

UNITED STATES of America, Respondent-Appellee.

No. 97-6365.

United States Court of Appeals,

Eleventh Circuit.

July 21, 2000.

Appeal from the United States District Court for the Northern District of Alabama. (Nos. 95-08005-CV-H-E and Cr 90-H-266-E), James H. Hancock, Judge.

Before ANDERSON, Chief Judge, TJOFLAT, EDMONDSON, COX, BIRCH, DUBINA, BLACK, BARKETT, HULL, MARCUS and WILSON, Circuit Judges.

EDMONDSON, Circuit Judge:

Petitioner, David Ronald Chandler, was sentenced to death for murder in furtherance of a continuing criminal enterprise under 21 U.S.C. § 848(e)(1)(A). We affirmed Petitioner's murder conviction and death sentence on direct appeal. *United States v. Chandler,* 996 F.2d 1073 (11th Cir.1993). Petitioner then filed a section 2255 petition challenging his conviction and sentence on several grounds. Among other things, Petitioner, invoking the Sixth Amendment, claimed that he received ineffective assistance of counsel—during the sentencing phase of trial—because his trial counsel failed to investigate and to present character witnesses. The district court rejected Petitioner's claims and denied relief. We affirm.[1]

## BACKGROUND

Petitioner ran an extensive marijuana growing and distribution operation in Northern Alabama. In January 1990, Petitioner had offered Charles Ray Jarrell, Sr., one of Petitioner's marijuana couriers, $500 to eliminate Marlin Shuler, a suspected informant; Jarrell has said he thought Petitioner was joking. On 8 May

---

[1]We conclude that only Petitioner's claim of ineffectiveness at sentencing warrants more discussion. Therefore, for the reasons set out by the district court and in our earlier, but now-vacated, panel decision, we affirm the district court's denial of habeas relief for Petitioner's other claims.

1990,[2] Petitioner saw Shuler at Jarrell's house. Petitioner warned Jarrell that Shuler was going to cause them trouble and stated: "You need to go on and take care of him and I still got that $500." Jarrell understood Petitioner to be referring to Petitioner's earlier offer to pay Jarrell should he eliminate Shuler. Petitioner left; Jarrell and Shuler spent the morning drinking heavily. The two men then drove to a lake for some target practice with two guns. During target practice, Jarrell turned a gun on Shuler, shot him twice, and killed him. Jarrell went to and informed Petitioner that he had killed Shuler; the two men returned to the scene and disposed of the body. Jarrell asked for, but did not receive, the $500.

In 1991, a nine-count indictment charged Petitioner with various drug, continuing criminal enterprise, and conspiracy offenses, including procuring Shuler's murder in furtherance of a continuing criminal enterprise.

Petitioner retained Drew Redden, a prominent Alabama criminal defense lawyer, to defend him at trial.[3] Redden actively pursued acquittal, especially on the charge of procuring a murder.[4] In preparation, trial counsel, among other things, observed the trial of a codefendant and reviewed material from the defense attorneys of the other defendants to the CCE charge. He consulted a jury selection expert. And trial counsel interviewed at least 67 witnesses in the Piedmont and Esom Hill area, Petitioner's small community. Believing his client not to be a true drug kingpin, counsel also spent time trying to find the "real" drug

---

[2]In March 1990, state law enforcement officers executed a search warrant at the home of one of Petitioner's dealers, based on information provided by Shuler.

[3]Redden had tried over 1000 cases, had formerly been a prosecutor at the U.S. Attorney's Office, was formerly president of the Alabama Bar, was a member of the American College of Trial Lawyers and the International Society of Barristers. He is listed in *America's Best Lawyers* for his criminal defense work. For further background, including academic honors, see the *Martindale-Hubble Law Directory*. By the way, the prosecutor said during the trial that Redden is an "extremely talented defense counsel, probably the best in the state [of Alabama]."

[4]At the section 2255 hearing, trial counsel testified that in his view "the guilt of murder to a capital degree ... was the weakest part of the [Government's] case." And he stated that, based on the circumstances of the Government's case, he believed "there was a fair chance" his client would be found not guilty and it was even "less likely" that he would get the death penalty.

kingpin. Trial counsel, throughout the case, was in frequent contact with Petitioner, Petitioner's brother, and Petitioner's wife.

To contest the murder charge, trial counsel introduced evidence at trial to show the weaknesses in the Government's case: that is, trial counsel attacked the idea that Petitioner had in reality caused, on the pertinent day, Shuler to be killed. A history of animosity existed between Jarrell and Shuler as a result of Shuler's former marriage to Jarrell's sister. Shuler had abused his ex-wife and mother-in-law (Jarrell's sister and mother respectively), which provided Jarrell with his own motives for killing Shuler. Jarrell—on an earlier occasion and for his own reasons—- had actually attempted to kill Shuler: Jarrell had placed a gun to Shuler's head and pulled the trigger, but the loaded gun had just not gone off. In addition, trial counsel stressed that the key Government witnesses in this case, including Jarrell himself, testified in exchange for lesser sentences. Furthermore, Jarrell, over time, had made inconsistent statements about Petitioner's responsibility for the murder: stating that he (Jarrell) did not do it; stating that he (Jarrell) alone did it intentionally because of personal animosity; admitting that he (Jarrell) did it but claiming it was an accident; and, at last, implicating Petitioner.

Nevertheless, the jury convicted Petitioner on all nine counts of the indictment, including the murder charge. The jury implicitly found that the Government proved beyond reasonable doubt that Petitioner had offered to pay, and induced, Jarrell to kill Shuler. A separate death penalty sentencing hearing on the murder count was held the next day.

At sentencing, the Government alleged three statutory aggravating factors: (1) that Petitioner had intentionally engaged in conduct resulting in the death of another, (2) that Petitioner procured the killing of another for money, and (3) that Petitioner committed the murder after substantial planning and premeditation. The Government offered no new evidence at the sentencing phase and relied on the evidence it had presented at the guilt phase.

3

Defense counsel did present evidence as well as arguments for mitigation, among other things, stressing residual doubt.[5] He reminded the jury—using a stipulation about the date of the death of the victim—that a taped statement, made by Petitioner about having to kill somebody (a tape the jury had requested to review at the guilt-stage deliberations), was made three months after the murder of Shuler and did not indicate that Petitioner was talking about Shuler. Trial counsel also entered into evidence two other stipulations: (1) that Petitioner had no prior criminal record, and (2) that Jarrell, the actual killer, and Jarrell's son (who was also implicated in the murder) would never be prosecuted for Shuler's murder. Both of these latter stipulations were mitigating factors as a matter of law under the pertinent statute. In addition, trial counsel called as character witnesses and presented to the jury the humanizing testimony of Petitioner's wife and mother.[6]

---

[5]In response to a question, trial counsel testified at the section 2255 hearing that, based on his "reasonable professional judgment," he had not believed that a reasonable jury would impose the death penalty given the weak case against his client:

> I did not feel that a reasonable minded jury would impose the death penalty on him, given not only the testimony as to what had occurred in November when Jarrell, Sr. undertook to kill Shuler, but also what occurred on the day that he did kill him. And that is, that they had consumed a tremendous amount of beer, been out there at Snow's Lake for a good while. I think they had given out of beer and gone back and gotten more beer. And that even if one assumed that Ronnie Chandler had offered him $500, well, this was still the act of a drunken mind overwhelmed by other things than a $500 offer.

And this view supports the argument (an argument mainly based on residual doubt about Petitioner's responsibility for the shooting) trial counsel pressed at the sentencing phase.

[6]Trial counsel explained to the jury the mitigating nature of the women's testimony this way:

> [The testimony of Petitioner's wife and mother] was here to show that there was a life here that has had a stability to it, that has had some quality to it and I think that is apparent when you looked at those two ladies ... and the fact that here is a family that had tremendous stability.... He's got three children, they are all by his wife. Here is a man who apparently has some skill of his hands who has worked in building his house and his parents' house, his brothers' houses and they've worked with him and this springs off the 80-acre farm that his father had with his father, way back. They built a sawmill, they cut trees, they made lumber, they collected rocks, they built houses and lives demonstrating lives with some purpose as opposed to life worthless. So that that is a mitigating factor that I think that you have certainly not just the right but the obligation to consider.

4

Given that the evidence was unconverted that Jarrell (not Petitioner) had actually killed the victim, trial counsel argued again at sentencing that the evidence was not absolutely conclusive about whether Jarrell, especially in his drunken state, was truly induced by Petitioner when Jarrell shot Shuler. Trial counsel pointed to evidence that Jarrell earlier, in November 1989, had—completely independent of Petitioner—put "a pistol to the nose of [Shuler] and pull[ed] the trigger intending to kill him": the gun had misfired. Trial counsel reiterated the independent malice Jarrell harbored for the victim as a result of their personal history. Trial counsel asked the jury how Petitioner could have motivated Jarrell at the time of the killing, when Jarrell (after Petitioner had left) had consumed "twenty-three beers on that date, twenty-three beers before he shot the man."[7] Trial counsel stressed that imposing the death penalty in this case would be "cruel and unusual punishment" and a "tremendous mistake ... considering every circumstance of this case."

The jury, however, found that the first two aggravating factors existed and unanimously recommended that Petitioner be sentenced to death. The district court, Judge Hancock, did so.

After exhausting his direct appeals, Petitioner moved to vacate his convictions and sentence under 28 U.S.C. § 2255 and moved for a new trial in accordance with Fed.R.Crim.P. 33 on many grounds, including ineffective assistance of counsel at sentencing. In the light of Petitioner's claims, the district court, Judge Hancock, conducted a series of evidentiary hearings.

On the ineffectiveness claim, Petitioner asserted that counsel was ineffective for failing to investigate and to present character witnesses at the sentencing hearing. At the section 2255 evidentiary hearing,

---

[7]Counsel also pointed out that Petitioner's alleged statements to Jarrell about killing Shuler, if made at all, were made only twice—the first occasion Jarrell himself characterized as a joke. Counsel reiterated to the jury, "if it took place, it was a thing that was not precipitated." The jury did not find extensive planning to be an aggravating factor.

5

Petitioner presented 27 witnesses who testified to specific good acts by Petitioner.[8] Petitioner also presented the testimony of defense counsel Redden.

Judge Hancock found that the mitigating value of the proffered witnesses was undercut on cross-examination: (1) the good character evidence related to a time remote from that of Petitioner's crimes; (2) many of the witnesses were ignorant of Petitioner's criminal activities altogether, showing an ignorance of Petitioner's character; and (3) all of the witnesses showed a strong bias in favor of Petitioner.[9]

The district court then considered the aggravating circumstances and found that the jury had determined that two aggravating factors existed based on a "particularly egregious crime": encouraging another, dependant upon him, to kill a police informant and then assisting in disposing of the body. The district court—"[w]eighing this weak character evidence against the strong aggravating evidence that the jury accepted"—concluded that prejudice was not proved. Therefore, the district court denied relief on the ineffectiveness claim.

DISCUSSION

Petitioner argues that he received ineffective assistance of counsel during the sentencing phase of his trial. We review Petitioner's claim of ineffective assistance de novo. *Williams v. Head,* 185 F.3d 1223, 1227 (11th Cir.1999). To succeed on a claim of ineffective assistance, Petitioner must show both incompetence and prejudice: (1) "[P]etitioner must show that 'counsel's representation fell below an objective standard of reasonableness,' " and (2) "[P]etitioner must show that 'there is a reasonable probability that, but

---

[8] For example, witnesses testified that Petitioner had bought shoes for a boy who did not have any; had given money to a family to help them bury their son; had bought groceries for people he thought needed them; had bought dinner for members of his construction crew who did not have the money to buy their own; had given lunch money to a neighbor's children; and had offered to allow a woman to stay at his house when her husband died.

[9] When cross-examined, the witnesses testified that knowledge of Petitioner's drug dealing, attempt to turn a gun on a police officer, and statement about having to kill someone if he were set up again, would not change their opinion of Petitioner. The district court found that this testimony "largely nullified the persuasive value" of this character testimony because the jury would not be likely to credit witnesses who "believed that drug dealing and violent crimes were irrelevant to a person's character."

6

for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 2473, 91 L.Ed.2d 144 (1986); *accord Williams v. Taylor,* --- U.S. ----, 120 S.Ct. 1495, 1511, 146 L.Ed.2d 389 (2000). Petitioner says that his trial counsel was incompetent because his trial counsel failed to investigate and to present character evidence. And, Petitioner says that—but for his trial counsel's failure to investigate and to present the evidence—a reasonable probability exists that the jury would not have voted for a death sentence.

## SOME PRINCIPLES GOVERNING PERFORMANCE

To aid courts in assessing claims of ineffective assistance under the Sixth Amendment, the Supreme Court and this court, particularly sitting en banc, have set out certain principles and presumptions.[10] We have recognized that, given these principles and presumptions, "the cases in which habeas petitioners can properly prevail ... are few and far between." *Waters v. Thomas,* 46 F.3d 1506, 1511 (11th Cir.1995) (en banc). A review of the principles and presumptions seems appropriate.[11]

I. The standard for counsel's performance is "reasonableness under prevailing professional norms." *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984); *accord Williams v. Taylor,* --- U.S. ----, 120 S.Ct. 1495, 1511, 146 L.Ed.2d 389 (2000) (most recent decision reaffirming that merits of ineffective assistance claim are squarely governed by *Strickland* ). The purpose of ineffectiveness review is not to grade counsel's performance. *See Strickland,* 104 S.Ct. at 2065; *see also White v. Singletary,* 972 F.2d 1218, 1221 (11th Cir.1992) ("We are not interested in grading lawyers' performances; we are

---

[10]Most of these principles and presumptions were expressly set out in three ineffective assistance cases in which the Supreme Court specifically addressed the issue of ineffective assistance of counsel at the sentencing stage for failure to investigate and to present mitigating evidence. In each case, the Court determined counsel was not ineffective. *See Burger v. Kemp,* 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) (death penalty case); *Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (death penalty case); *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (death penalty case).

[11]There are different kinds of ineffective assistance claims. Here, Petitioner does not allege that his trial counsel's performance was impaired by an incapacity (mental or physical), a conflict of interest, bad faith, or an unreasonable mistake of law. Therefore, we decide nothing today about these other kinds of cases.

interested in whether the adversarial process at trial, in fact, worked adequately."). We recognize that "[r]epresentation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another." *Strickland,* 104 S.Ct. at 2067. Different lawyers have different gifts; this fact, as well as differing circumstances from case to case, means the range of what might be a reasonable approach at trial must be broad. To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or "what is prudent or appropriate, but only what is constitutionally compelled."[12] *Burger v. Kemp,* 483 U.S. 776, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987).

II. The burden of persuasion is on a petitioner to prove, by a preponderance of competent evidence, that counsel's performance was unreasonable. *See Strickland,* 104 S.Ct. at 2064; *see also Williams,* 120 S.Ct. at 1511 ("[D]efendant must show that counsel's representation fell below an objective standard of reasonableness.") (internal citations and quotations omitted). The petitioner must establish that particular and identified acts or omissions of counsel "were outside the wide range of professionally competent assistance." *Burger,* 107 S.Ct. at 3126; *see also Strickland,* 104 S.Ct. at 2064-65 (stating that petitioner must show "counsel's representation fell below an objective standard of reasonableness"—that is, that counsel's performance was unreasonable "under prevailing professional norms ... considering all of the circumstances").

III. "Judicial scrutiny of counsel's performance must be highly deferential."[13] *Strickland,* 104 S.Ct. at 2065. We must avoid second-guessing counsel's performance: "[I]t does not follow that any counsel who

---

[12]"The test for ineffectiveness is not whether counsel could have done more; perfection is not required. Nor is the test whether the best criminal defense attorneys might have done more. Instead the test is ... whether what they did was within the 'wide range of reasonable professional assistance.' " *Waters,* 46 F.3d at 1518 (en banc) (citations omitted).

[13]"It is important to note that judicial scrutiny of an attorney's performance is appropriately highly deferential because the craft of trying cases is far from an exact science; in fact, it is replete with uncertainties and obligatory judgment calls." *Bolender v. Singletary,* 16 F.3d 1547, 1557 (11th Cir.1994).

takes an approach we would not have chosen is guilty of rendering ineffective assistance."[14] *Waters,* 46 F.3d at 1522 (en banc). Nor does the fact that a particular defense ultimately proved to be unsuccessful demonstrate ineffectiveness.

IV. Courts must "indulge [the] strong presumption" that counsel's performance was reasonable and that counsel "made all significant decisions in the exercise of reasonable professional judgment." *Strickland,* 104 S.Ct. at 2065-66; *accord Williams v. Head,* 185 F.3d 1223, 1227-28 (11th Cir.1999) (presuming counsel rendered effective assistance). Thus, counsel cannot be adjudged incompetent for performing in a particular way in a case, as long as the approach taken "might be considered sound trial strategy." *Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 2474, 91 L.Ed.2d 144 (1986). Given the strong presumption in favor of competence, the petitioner's burden of persuasion—though the presumption is not insurmountable—is a heavy one.[15] *Kimmelman v. Morrison,* 477 U.S. 365, 106 S.Ct. 2574, 2586, 91 L.Ed.2d

---

[14]In accordance with this principle, courts must recognize that counsel does not enjoy the benefit of unlimited time and resources. *See Rogers v. Zant,* 13 F.3d 384, 387 (11th Cir.1994). Every counsel is faced with a zero-sum calculation on time, resources, and defenses to pursue at trial.

And, a court must not second-guess counsel's strategy. *Waters,* 46 F.3d at 1518-19 (en banc). By "strategy," we mean no more than this concept: trial counsel's course of conduct, that was neither directly prohibited by law nor directly required by law, for obtaining a favorable result for his client. For example, calling some witnesses and not others is "the epitome of a strategic decision." *Id.* at 1512 (en banc); *see also id.* at 1518-19 (en banc); *Felker v. Thomas,* 52 F.3d 907, 912 (11th Cir.1995) (whether to pursue residual doubt or another defense is strategy left to counsel, which court must not second-guess); *Stanley v. Zant,* 697 F.2d 955, 964 (11th Cir.1983) (stating that reliance on line of defense to exclusion of others is matter of strategy).

[15]The presumption impacts on the burden of proof and continues throughout the case, not dropping out just because some conflicting evidence is introduced. "Counsel's competence ... is presumed, and the [petitioner] must rebut this presumption by *proving* that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." *Kimmelman v. Morrison,* 477 U.S. 365, 106 S.Ct. 2574, 2588, 91 L.Ed.2d 305 (1986) (emphasis added) (citations omitted). An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption. Therefore, "where the record is incomplete or unclear about [counsel]'s actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment." *Williams,* 185 F.3d at 1228; *see also Waters,* 46 F.3d at 1516 (en banc)(noting that even though testimony at habeas evidentiary hearing was ambiguous, acts at trial indicate that counsel exercised sound professional judgment).

The presumption about which we write here is not some presumption that the particular

305 (1986); *see also Williams,* 120 S.Ct. at 1511 ("[T]he defendant must show that counsel's performance was deficient." (quoting *Strickland,* 104 S.Ct. at 2064)).

---

defense lawyer in reality focused on and, then, deliberately decided to do or not to do a specific act. Instead, the presumption to which we refer is the presumption that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some reasonable lawyer might do.

The Supreme Court has instructed that there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 104 S.Ct. at 2065. This presumption is like the "presumption of innocence" in a criminal trial, in which "the defendant is not required to come forward with proof of his innocence once evidence of guilt is introduced to avoid a directed verdict of guilty." *Black's Law Dictionary* 823 (6th. ed.1991). This presumption of competence must be disproved by a petitioner. Petitioner continually bears the burden of persuasion on the constitutional issue of competence and further, (adding the prejudice element) on the issue of ineffective assistance of counsel. *See Strickland,* 104 S.Ct. at 2064 (stating that "defendant must show that counsel's performance was deficient" and that defendant must also show prejudice). Never does the government acquire the burden to show competence, even when some evidence to the contrary might be offered by the petitioner.

10

V. The reasonableness of a counsel's performance is an objective inquiry.[16] *See Darden,* 106 S.Ct. at 2474 (noting that counsel's performance did not fall below "an objective standard of reasonableness"); *see also Williams,* 120 S.Ct. at 1511 (same); *Darden,* 106 S.Ct. at 2474 (noting that "there are several reasons why counsel reasonably *could* have chosen to rely on" the defense that he did (emphasis added)); *United States v. Fortson,* 194 F.3d 730, 736 (6th Cir.1999) (determining—without district court findings or even evidentiary hearing—that defendant had not overcome presumption of effective assistance because court "[could] conceive of numerous reasonable strategic motives" for counsel's actions at trial). And because counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take.[17]

---

[16]To uphold a lawyer's strategy, we need not attempt to divine the lawyer's mental processes underlying the strategy. "There are countless ways to provide effective assistance in any given case." *Strickland,* 104 S.Ct. at 2065. No lawyer can be expected to have considered all of the ways. If a defense lawyer pursued course A, it is immaterial that some other reasonable courses of defense (that the lawyer did not think of at all) existed and that the lawyer's pursuit of course A was not a deliberate choice between course A, course B, and so on. The lawyer's strategy was course A. And, our inquiry is limited to whether this strategy, that is, course A, might have been a reasonable one. *See generally Harich v. Dugger,* 844 F.2d 1464, 1470-71 (11th Cir.1988) (en banc) (concluding—without evidentiary hearing on whether counsel's strategy arose from his ignorance of law—that trial counsel's performance was competent because hypothetical competent counsel reasonably could have taken action at trial identical to actual trial counsel), *replacing vacated panel opinion,* 813 F.2d 1082 (11th Cir.1987) (2-1 opinion) (remanding for evidentiary hearing on whether pursuit at trial of actual innocence defense, instead of intoxication defense or a combination of defenses, was informed strategic decision); *Bonin v. Calderon,* 59 F.3d 815, 838 (9th Cir.1995) (holding—where petitioner alleged that trial counsel's mental processes were impaired by drug use—that, because an objective standard is used to evaluate counsel's competence, "once an attorney's conduct is shown to be objectively reasonable, it becomes unnecessary to inquire into the source of the attorney's alleged shortcomings"). See also *Roe v. Flores-Ortega,* --- U.S. ----, 120 S.Ct. 1029, 1037, 145 L.Ed.2d 985 (2000) ("The relevant question is not whether counsel's choices were strategic, but whether they were reasonable.").

> We look at the acts or omissions of counsel that the petitioner alleges are unreasonable and ask whether some reasonable lawyer could have conducted the trial in that manner. Because the standard is an objective one, that trial counsel (at a post-conviction evidentiary hearing) admits that his performance was deficient matters little. *See Tarver v. Hopper,* 169 F.3d 710, 716 (11th Cir.1999) (noting that "admissions of deficient performance are not significant"); *see also Atkins v. Singletary,* 965 F.2d 952, 960 (11th Cir.1992) ("[I]neffectiveness is a question which we must decide, [so] admissions of deficient performance by attorneys are not decisive.").

[17]If some reasonable lawyer might have not pursued a certain defense or not called a certain witness, we fail to understand why we would order a new trial on the ground that the actual lawyer had not used the

*See Waters,* 46 F.3d at 1512 (en banc) ("The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial."); *see also Harich v. Dugger,* 844 F.2d 1464, 1470 (11th Cir.1988) (en banc) ("It is not enough for petitioner to claim his counsel was ignorant of the Florida law. Petitioner must prove that the approach taken by defense counsel would not have been used by professionally competent counsel"); *Provenzano v. Singletary,* 148 F.3d 1327, 1332 (11th Cir.1998) (noting that counsel's conduct is unreasonable only if petitioner shows "that no competent counsel would have made such a choice"); *Burger,* 107 S.Ct. at 3124 (in concluding that defense counsel's not using character witnesses met reasonableness standard, Court pointed out that district court judge—presumably a reasonable lawyer—who heard the proffered mitigating evidence did not think it would have aided petitioner's case).

VI. When courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger.[18] *See Provenzano,* 148 F.3d at 1332 (stating that "strong reluctance to second guess strategic decisions is even greater where those decisions were made by experienced criminal defense counsel" and that "[t]he more experienced an attorney is, the more likely it is that his decision to rely on his own experience and judgment in rejecting a defense" is reasonable); *see also*

---

defense or witness in the first trial: at the new trial, a different lawyer (even a reasonable one) might again not use the witness or defense. If two trials are identical, one should not be constitutionally inadequate and the other constitutionally adequate.

[18]We accept that even the very best lawyer could have a bad day. No one's conduct is above the reasonableness inquiry. Just as we know that an inexperienced lawyer can be competent, *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 2050, 80 L.Ed.2d 657 (1984) (inexperienced does not mean ineffective), so we recognize that an experienced lawyer may, on occasion, act incompetently. Our point is a small one: Experience is due some respect.

*Burger,* 107 S.Ct. at 3118 (reciting counsel's impressive credentials in opinion finding that counsel rendered effective assistance).[19]

VII. In reviewing counsel's performance, a court must avoid using "the distorting effects of hindsight" and must evaluate the reasonableness of counsel's performance "from counsel's perspective at the time." *Strickland,* 104 S.Ct. at 2065. "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."[20] *Id.; see Waters,* 46 F.3d at 1514 (en banc) ("The widespread use of the tactic of attacking trial counsel by showing what 'might have been' proves that nothing is clearer than hindsight—except perhaps the rule that we will not judge trial counsel's performance through hindsight.").

VIII. No absolute rules dictate what is reasonable performance for lawyers. *Strickland,* 104 S.Ct. at 2065 ("No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant."); *see also Roe v. Flores-Ortega,* --- U.S. ----, 120 S.Ct. 1029, 1036-37, 145 L.Ed.2d 985 (2000) (rejecting bright-line rule that counsel "almost always" has duty to consult with defendant about

---

[19]"[Counsel] had been practicing law in Wayne County for about 14 years, had served as the county's attorney for most of that time, and had served on the Board of Governors of the State Bar Association. About 15 percent of his practice was in criminal law, and he had tried about a dozen capital cases. It is apparent that he was a well-respected lawyer, thoroughly familiar with practice and sentencing juries in the local community." *Burger,* 107 S.Ct. at 3118.

[20]For example, "[i]t is common practice for petitioners attacking their death sentences to submit affidavits from witnesses who say they could have supplied additional mitigating [ ] evidence, had they been called or ... had they been asked the right questions." *Waters,* 46 F.3d at 1514 (en banc). But "[t]he mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel." *Id.* (noting that such witnesses show nothing more than that, "with the luxury of time and the opportunity to focus resources on specific parts of a made record, post-conviction counsel will inevitably identify shortcomings"). And, basing the inquiry on whether an investigation (if one had been undertaken) would have uncovered mitigating evidence (or witnesses) is an example of judging counsel's acts from the benefit of hindsight. The proper inquiry was articulated in *Rogers v. Zant:* "Once we conclude that declining to investigate further was a reasonable act, we do not look to see what a further investigation would have produced." 13 F.3d 384, 388 (11th Cir.1994).

appeal, reaffirming that the Court has "consistently declined to impose mechanical rules on counsel—even when those rules might lead to better representation").  "Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland,* 104 S.Ct. at 2065; *see also id.* at 2066 (stating that " rigid requirements [would] dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client");  *Waters,* 46 F.3d at 1511 (en banc) (noting that Supreme Court has prohibited "[i]ntensive scrutiny of counsel and [the creation of] rigid requirements for acceptable assistance").  The law must allow for bold and for innovative approaches by trial lawyers.  And, the Sixth Amendment is not meant "to improve the quality of legal representation," but "simply to ensure that criminal defendants receive a fair trial." *Strickland,* 104 S.Ct. at 2065.

IX. Thus, no absolute duty exists to investigate particular facts or a certain line of defense.  Under *Strickland,* counsel's conducting or not conducting an investigation need only be reasonable to fall within the wide range of competent assistance.  104 S.Ct. at 2066 (stating that counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary");  *cf. Kimmelman,* 106 S.Ct. at 2588 (failure to file timely motion to suppress unlawfully obtained evidence amounts to constitutionally ineffective assistance when failure is based on counsel's *unreasonable mistake of law* about the Government's duty to supply certain information to defense counsel before trial) (emphasis added);  *Williams,* 120 S.Ct. at 1514 (failure to conduct investigation ineffective because based, in part, on lawyer's *mistake of law* that information not discoverable).[21]

---

[21]We do not read *Williams* to declare a per se rule of law that a defense lawyer must present character witnesses at the sentencing phase or that a defense lawyer (no matter what his client may have informed or instructed him) must in every case investigate purely to see if character witnesses might exist who might be of help at the sentencing phase.

We understand *Williams* to create no mechanistic rule of law at all for investigation or for presentation of evidence in capital cases. *See generally Cohens v. Virginia,* 19 U.S. (6 Wheat.) 264, 399, 5 L.Ed. 257 (1821) (Marshall, C.J.) ("It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions

14

And counsel need not always investigate before pursuing or not pursuing a line of defense. Investigation (even a nonexhaustive, preliminary investigation) is not required for counsel reasonably to decline to investigate a line of defense thoroughly.[22] *See Strickland,* 104 S.Ct. at 2066 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional

are used."); *Crawford-El v. Britton,* 523 U.S. 574, 118 S.Ct. 1584, 1590, 140 L.Ed.2d 759 (1998) ("There is, of course, an important difference between the holding in a case and the reasoning that supports that holding."). In particular, we do not understand the Supreme Court to make the ABA Standards part of the highest law of the land, even if one accepts that those standards reflect a good policy. We remember that these ABA Standards were also mentioned in *Strickland;* but the Court went on to shun per se rules. *Strickland,* 104 S.Ct. at 2065; *accord Roe,* 120 S.Ct. at 1036-37.

We read *Williams* to decide this question about lawyer performance: where a capital defendant (with a significant criminal record) has repeatedly admitted before trial that he, in fact, did kill the victim in the course of a theft so that a defense of factual innocence hardly existed and where, at the sentencing phase, the defense counsel, while repeatedly telling the jury that it was hard to explain why the jury should spare defendant's life, presents no evidence of the defendant's "nightmarish" childhood (criminal neglect by his parents, repeated severe beatings by his father, and abuse in a foster home)—not because defense counsel thought such evidence would not be compelling (defense counsel testified at a habeas hearing that it was important evidence which he would have used had he known of it), but because he "incorrectly thought" that state law barred his access to the juvenile and social services records in which such information could be found—the defense lawyer's performance at sentencing was deficient.

But the present case is different from *Williams* not only in the kinds of evidence that are involved, but in its other material facts: for example, here defendant's factual guilt was strongly disputed (and still is); here no one contends that the defense counsel's not presenting more character witnesses was due to a mistaken view of the law (he did not think a search for such witnesses was prohibited by law or that character witnesses would, as a matter of law, be excluded); here defense counsel has never said that character witnesses would be very helpful or that he would have used them if he had known of them (and the trial judge who has heard and seen the pertinent character witnesses has said that, in his opinion, they would not have been helpful if introduced); here defense counsel did raise mitigating factors unavailable in *Williams.*

*Williams* cannot command the outcome for this case; the cases' facts are materially different, allowing different outcomes under *Strickland.*

[22]As we have recognized, *Strickland* 's approach toward investigation "reflects the reality that lawyers do not enjoy the benefit of endless time, energy or financial resources." *Rogers,* 13 F.3d at 387. How a lawyer spends his inherently limited time and resources is also entitled to great deference by the court. *See White,* 972 F.2d at 1224 ("[G]iven the finite resources of time and money that face a defense attorney, it simply is not realistic to expect counsel to investigate substantially all plausible lines of defense. A reasonably competent attorney often must rely on his own experience and judgment, without the benefit of a substantial investigation, when deciding whether or not to forego a particular line of defense....").

judgments support the limitations on investigation."); *id.* ("In any ineffectiveness case, a particular decision *not* to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." (emphasis added)); *Williams,* 185 F.3d at 1236-37 (noting that this circuit has rejected idea that "strategic decisions can be considered reasonable only if they are preceded by a 'thorough investigation' " and stating that, to be effective, counsel is not "required to 'pursue every path until it bears fruit or until all hope withers' "); *Rogers v. Zant,* 13 F.3d 384, 387 (11th Cir.1994) ("By its nature, 'strategy' can include a decision not to investigate ... [and] a lawyer can make a reasonable decision that no matter what an investigation might produce, he wants to steer clear of a certain course."); *see also Holladay v. Haley,* 209 F.3d 1243, 1252 (11th Cir.2000) (noting that our circuit has rejected "a per se rule of ineffective assistance where counsel does not consult family members"). For example, counsel's reliance on particular lines of defense to the exclusion of others—whether or not he investigated those other defenses—is a matter of strategy and is not ineffective unless the petitioner can prove the chosen course, in itself, was unreasonable.[23]

X. Because the reasonableness of counsel's acts (including what investigations are reasonable) depends "critically" upon "information supplied by the [petitioner]" or "the [petitioner]'s own statements or actions," evidence of a petitioner's statements and acts in dealing with counsel is highly relevant to ineffective assistance claims. *Strickland,* 104 S.Ct. at 2066. "[An] inquiry into counsel's conversations with the [petitioner] may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions."[24] *Id.* ("[W]hen a defendant has given

---

[23]Requiring that counsel always do certain acts to be found effective (for example, interviewing some of petitioner's neighbors for mitigation evidence) would contravene the Supreme Court's directive that no set of detailed rules for counsel's conduct should be used to evaluate ineffectiveness claims. *See Strickland,* 104 S.Ct. at 2065.

[24]And, when the circumstances of a claim make these conversations relevant, the petitioner can rarely (if ever) satisfy his burden to disprove the presumption of effective assistance without disclosing the substance of these attorney-client conversations. *Cf. Laughner v. United States,* 373 F.2d 326, 327 (5th Cir.1967) (refusing to allow petitioner, who requested a section 2255 evidentiary hearing, to invoke

16

counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.").

XI. Counsel is not required to present every nonfrivolous defense; nor is counsel required to present all mitigation evidence, even if the additional mitigation evidence would not have been incompatible with counsel's strategy. *See Waters,* 46 F.3d at 1511 (en banc) (noting that no absolute duty exists to present all possible mitigating evidence available: "Our decisions are inconsistent with any notion that counsel must present all available mitigating circumstance evidence."). Considering the realities of the courtroom, more is not always better. Stacking defenses can hurt a case. Good advocacy requires "winnowing out" some arguments, witnesses, evidence, and so on, to stress others. *See Rogers,* 13 F.3d at 388 (citing *Jones v. Barnes,* 463 U.S. 745, 103 S.Ct. 3308, 3313, 77 L.Ed.2d 987 (1983)); *see also Waters,* 46 F.3d at 1512 (en banc) ("There is much wisdom for trial lawyers in the adage about leaving well enough alone.").

XII. No absolute duty exists to introduce mitigating or character evidence.[25] *See Tarver v. Hopper,* 169 F.3d 710, 715 (11th Cir.1999) (noting that counsel is not "required to investigate and present all available mitigating evidence to be reasonable") (citing *Burger,* 107 S.Ct. at 3126); *Stanley v. Zant,* 697 F.2d 955, 961 (11th Cir.1983) (no duty to present general character evidence); *see also Waters,* 46 F.3d at 1511 (en banc) (noting this court and Supreme Court have held counsel's performance to be constitutionally sufficient when no mitigation evidence was produced even though it was available). *See, e.g., Burger,* 107 S.Ct. at 3126

---

attorney-client privilege to "eliminate the one source of evidence likely to contradict his allegations"); *Williams,* 185 F.3d at 1235 ("Given the lack of clarity of the record, we presume that [counsel] talked with [petitioner] as part of his effort to ascertain whether there was any mitigating circumstance evidence....").

[25]While Petitioner is correct that capital defendants have a right to present just about any evidence in mitigation at the sentencing phase, this right is the right to be free of governmental interference with the presentation of evidence. *See generally Hitchcock v. Dugger,* 481 U.S. 393, 107 S.Ct. 1821, 1824, 95 L.Ed.2d 347 (1987). The question of admissibility of evidence is different from whether counsel acted reasonably in not introducing the evidence. *See Burger,* 107 S.Ct. at 3123 n. 7. And the cases concerning the constitutional right of defendants not to be precluded or limited by the state or the court in their presentation of mitigation evidence at sentencing do not support the proposition that, if counsel does not present all possible mitigation at sentencing, then defendant has been denied some constitutional right.

17

(finding counsel effective even though counsel presented no mitigation evidence at all); *Darden,* 106 S.Ct. at 2474 (same).

These principles guide the courts on the question of "reasonableness," the touchstone of a lawyer's performance under the Constitution.

PERFORMANCE IN THIS CASE

Petitioner says that his trial counsel's performance during the sentencing phase of his trial was unreasonable. Trial counsel at the sentencing phase called Petitioner's mother and wife to testify, advanced two statutory mitigating factors, and stressed lingering doubt about Petitioner's true guilt. Our court's proper inquiry is limited to whether this course of action might have been a reasonable one. And, we begin with the strong presumption that it was. We conclude that—given the record in this case and taking in the principles for ineffective assistance claims—Petitioner has failed, as a matter of law, to overcome the presumption.

Although Petitioner's claim is that his trial counsel should have done something more, we first look at what the lawyer did in fact. Trial counsel focused on obtaining an acquittal and then, at sentencing, on lingering doubt.[26] This defense was a reasonable one.[27] We have said before that focusing on acquittal at trial

_____

[26]In his sentencing argument, defense counsel did not use the words "lingering doubt" or "residual doubt." But, as the government pointed out in its first brief filed in this court, defense counsel's argument at sentencing attacked the government's aggravating factors: the factors expressly included that Petitioner "intentionally engaged in conduct intending that [the victim] be killed and resulting in [the victim's] death." And, trial counsel did argue at some length that the evidence showing that defendant in fact had caused the actual killer to shoot the victim was disputed evidence; and he pointed to the weakness of the evidence as a ground for a sentence other than death: for example, the lawyer argued "What prompted [the killer] in his actions. How much did anything that was said to him on that day by [Petitioner] impel him, motivate him to do what he did after twenty-three beers on that date, twenty-three beers before he shot the man."

In the context of the trial and sentencing proceeding, defense counsel's argument, stressing the lack of strong evidence of guilt, cannot be said to be unconnected to "lingering doubt." We recognize the argument as a lingering-doubt argument and would not approve a district court's finding otherwise.

[27]At least when guilt in fact is denied, a "lawyer's time and effort in preparing to defend his client in the guilt phase of a capital case continues to count at the sentencing phase." *Tarver v. Hopper,* 169 F.3d 710, 715 (11th Cir.1999); *see also Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 2473, 91 L.Ed.2d 144 (1986) (rejecting petitioner's argument that counsel had only spent the time between conviction and

18

and then on residual doubt at sentencing (instead of other forms of mitigation) can be reasonable. *See Tarver v. Hopper,* 169 F.3d 710, 715-16 (11th Cir.1999). Especially when—as in this case—the evidence of guilt was not overwhelming,[28] we expect that petitioners can rarely (if ever) prove a lawyer to be ineffective for relying on this seemingly reasonable strategy to defend his client.

---

sentencing preparing the case for mitigation because "counsel engaged in extensive preparation prior to trial, *in a manner that included preparation for sentencing* ") (emphasis added); *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 1769, 90 L.Ed.2d 137 (1986) ("[I]t seems obvious to us that in most, if not all, capital cases much of the evidence adduced at the guilt phase of the trial will also have a bearing on the penalty phase....").

Trial counsel, at the section 2255 hearing, testified that he had believed "there was a fair chance" his client would be found not guilty, and it was even "less likely" that he would get the death penalty given the circumstances of the murder case. These views are reasonable considering the evidence at the trial.

In this case, when we refer to trial counsel's testimony explaining his personal mental processes (assessing the strengths of the prosecution's case, opining on the value of character witnesses and so on), we are not accepting that his words represent his heartfelt views, that is we are not crediting his testimony as absolutely true; but we point to this lawyer's testimony as illustrating the kinds of thoughts some lawyer in the circumstances *could*—we conclude—reasonably have had. The trial counsel's testimony is not essential to today's affirmance.

[28]We have accepted that residual doubt is perhaps the most effective strategy to employ at sentencing. *See Tarver,* 169 F.3d at 715-16 (citing law review study concluding that "the best thing a capital defendant can do to improve his chances of receiving a life sentence ... is to raise doubt about his guilt"). Counsel cannot be held to be ineffective when he has taken a line of defense which is objectively reasonable.

The jury in this case was instructed at the guilt phase this way: "[I]t is not necessary that the defendant's guilt be proven beyond all possible doubt. It is only required that the Government's proof exclude any reasonable doubt concerning the defendant's guilt." As this instruction shows, the law recognizes that jurors who have found a person guilty of a crime may well still have doubt about his true guilt. Thus, the law itself points to and lays the foundation for a good argument based on lingering doubt when the jury is later asked to impose death, the ultimate and most irremediable punishment. Nothing about this argument signals submissiveness or fatalism; stressing residual doubt is a straightforward and sound defense.

19

Trial counsel did not pursue character witnesses for mitigation;[29] but he had other mitigators in hand. That trial counsel's approach (preparing and presenting a case for doubt about Petitioner's guilt instead of focusing on mitigating character evidence) was reasonable is even more clear in the light of the questionable value of the mitigating character evidence.

A lawyer reasonably could have determined that character evidence would not be compelling in this case. And a lawyer reasonably could also fear that character evidence might, in fact, be counterproductive: it might provoke harmful cross-examination and rebuttal witnesses.[30] Misgivings about hurtful cross-examination and rebuttal witnesses have been decisive to the Supreme Court when it determined that counsel was effective. *See, e.g., Burger v. Kemp,* 483 U.S. 776, 107 S.Ct. 3114, 3124-25, 97 L.Ed.2d 638

---

[29]Petitioner tries to make much of trial counsel's asking Petitioner's wife—after the guilty verdict—to find witnesses and of trial counsel's saying at the section 2255 hearing that he had a hope that some character witnesses might be presented to him (though he stated that it was not a hope "that I really spent a lot of time or effort on or felt that there was that much time to spend on"). Petitioner claims this request of his wife shows that trial counsel really wanted character witnesses but had not invested the time and energy to find them. *This circumstance, even if true, would not be decisive:* recall especially that our inquiry is an *objective* one and that we are not attempting to grade this counsel's performance, but are looking at the trial just to see if the trial (as it was) was adequate. Moreover, the evidence of a request to the wife—at least, as strongly—shows the laudable fact that trial counsel, like most good trial lawyers, was flexible and opportunistic: he did not think character witnesses would be helpful or a good use of his time to pursue, but a reasonable lawyer might not foreclose himself altogether from considering some if they were presented to him. In fact, one such character witness was presented to trial counsel; counsel did not use him.

[30]Two character witnesses were presented at the sentencing stage: Petitioner's wife and mother. Petitioner also argues that trial counsel was ineffective for his limited preparation of and for his limited questioning of the wife and mother. Petitioner contends that, if trial counsel had asked the right questions, the lawyer could have elicited more mitigation testimony from them. *But see Waters v. Thomas,* 46 F.3d 1506, 1514 (11th Cir.1995) (en banc) (counsel not ineffective for failing to elicit more testimony from the witnesses because perfection is not required). Considering concerns about opening the door, a reasonable lawyer might well limit his questioning of the wife and mother: as it was, the wife and mother did escape cross-examination altogether.

> The testimony that was elicited reminded the jury that Petitioner was a husband, a father, and a son: humanizing circumstances. The wife and mother addressing the jury also reminded the jury that innocent people would suffer if this man was put to death. Bringing the family's existence and pain to the attention of the jury is powerful in and of itself. *See id.* at 1519 (noting that, sometimes, just having a witness on the stand can humanize petitioner in eyes of jury). We cannot say the Constitution demanded that more be done with these witnesses.

20

(1987) (concluding that failure to introduce character evidence was effective performance because witnesses could have been subjected to harmful cross-examination or invited other damaging evidence); *Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 2474, 91 L.Ed.2d 144 (1986) (same); *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 2057 & 2071, 80 L.Ed.2d 674 (1984) (same). Trial counsel in this case has testified that he had these thoughts and concerns.

At the section 2255 hearing, trial counsel testified that, although he knew that testimony about Petitioner's character would be admissible as mitigation evidence, he thought that character witnesses would not be very helpful or compelling, in this case. "[I]t would be at least questionable whether a sufficient impact of character type testimony could overcome a fixed opinion based on the other evidence ... [whether it] could change it from life to death. Or death to life."[31] The trial record indicates that counsel used other evidence and stressed lingering doubt. He thought character evidence (even evidence of specific good acts by Petitioner) would not prevent the jury—if they were sure Petitioner had procured this murder—from giving Petitioner the death penalty.[32] And trial counsel also questioned whether evidence of instances of

---

[31]Trial counsel testified:

> Q: And that specific instances of the defendant helping people is probably the most compelling of that type of evidence, a mere opinion that he's a good person is one thing, but to say he did this for me is even better. You recognized that, did you not?
>
> A: Well, I recognize its admissibility as a compelling nature, I wouldn't test it.
>
> Q: You didn't think that type of testimony would be very helpful, is that your testimony?
>
> A: Well I'm—if that's your question, I say in the whole picture of things as it existed at that time, if that jury was going to give him the death penalty based on what they had heard, their minds were made up as to that, I doubted that compelling would be an appropriate word.

[32]Trial counsel stated that he did not need to know what a witness would say to determine whether the witness would be compelling at mitigation. He stated that you assume what a piece of testimony might be and "assume the most favorable testimony that you might get and then form some judgment, not the most reliable judgment in the world, but some judgment about how compelling it might be." We agree.

21

Petitioner's specific good acts would have been compelling, considering that the Government was not arguing that Petitioner was in all ways a bad man, but arguing that he had committed specific criminal acts, including offering to pay for a murder.[33]

As every reasonable trial lawyer knows, character witnesses that counsel called could be cross-examined by the Government. And as trial counsel said, such cross-examination might not be helpful to his case. It is uncontroverted that, based on his earlier interviews with people in the pertinent community, he knew that "some individuals in the community considered [Petitioner] to be a drug dealer" and "that there were people in the community [who] were afraid of him."

Trial counsel also had seen at this very trial how a character witness's testimony could be twisted by cross-examination and the arguments of opposing counsel. A witness at the guilt phase testified that Petitioner had given him some property for a house after the witness was newly married, even though the witness did not have the money to pay for the land. Trial counsel then had attempted to paint the story as good-act evidence. Trial counsel accurately noted that the Government, however, used this testimony to argue that Petitioner's gift to this man was, in reality, part of a money laundering operation.[34]

---

[33]The record shows:

> [Habeas Counsel] Q: ... [I]nstances like that [of good acts], would have been something to refute the government's claim that [Petitioner] was just a bad person, wouldn't it?
>
> [Trial Counsel] A: If that had been the claim, yes.
>
> Q: All right. But they did claim that, did they not?
>
> A: Well, I don't think they claimed that he was just a bad person. I think that they claimed that he was guilty of a specific offense with which I disagreed, but I can't say that the case was just that he was a bad person.

[34]To anyone familiar with popular books and films about organized crime, such as Mario Puzo's *The Godfather,* the idea that a criminal was helpful to many people in his community (perhaps on account of his goodness or perhaps out of maintaining the very helpful goodwill of the community in which the defendant is operating a criminal enterprise) would be familiar. In fact, the generosity of a man, convicted of being a drug kingpin, might reenforce those stereotypes. For a lawyer to worry about counterargument even to

That counsel's concerns about using character evidence were reasonable is confirmed by the transcript of the evidentiary hearing for section 2255 relief. At the hearing, the Government did effectively cross-examine the proffered character witnesses. The district court judge—the same, very experienced judge who presided at the murder trial itself—after seeing and hearing these witnesses, did not think they were helpful to Petitioner's case because they were nullified on cross-examination. *See Burger,* 107 S.Ct. at 3124 (concluding that trial counsel acted reasonably in not calling witness at sentencing that district judge later heard fully at habeas hearing and found not to be helpful); *see also White v. Singletary,* 972 F.2d 1218, 1225 (11th Cir.1992) (questioning whether counsel would even have presented evidence had he possessed it because it had substantial internal weaknesses).

Trial counsel also testified that he was "fearful" of rebuttal witnesses: "I felt that the law enforcement community in Piedmont, in that part of the county, was hostile to [Petitioner], antagonistic to him. And that they certainly could have produced witnesses of that sort."[35] A reasonable lawyer could decide to limit

---

evidence of good deeds is not unreasonable.

The record from the evidentiary hearing provides other examples of how the character evidence could be considered aggravating. One man testified that Petitioner had donated $10,000 to the church, but the Government brought out on cross that Petitioner's entire reported income for the year was $10,000. And even those who testified that Petitioner was a regular churchgoer, admitted on cross that his attendance had dropped off in the years preceding his arrest. *See Stanley v. Zant,* 697 F.2d 955, 970 (11th Cir.1983) (questionable whether evidence would have been perceived as mitigating by the jury because church attendance could be perceived as aggravating: "if [he] went to the church, then he should have known the extreme culpability of his conduct").

[35]Trial counsel testified that deciding whether to put on character evidence requires a balancing determination, which he made in this case, and that he "[had] to evaluate the impact of that along with everything else that you evaluate." The record contains the following exchange:

Q: And I believe you stated that in determining whether or not to put on a character witness in view of the possibility of cross-examination by the government concerning various bad acts requiring a balancing act on your part, to determine whether or not the value of the witness, character witness would outweigh that possible damage done by that cross examination; is that correct?

[Trial Counsel] A: Well, balancing of the factors favorable and unfavorable and what I am saying is that that normally doesn't back you off putting on a character witness, but it's

23

reliance on character testimony instead of exposing the jury (right at sentencing) to a new string of Government witnesses who could testify to Petitioner's bad acts.[36] We must conclude that trial counsel's approach to the sentencing proceedings was a reasonable one.

Petitioner, on this record, has given us no cause to doubt this conclusion. Petitioner never testified at his section 2255 hearing. The reasonableness of a trial counsel's acts, including lack of investigation or

---

a fact that they might be asked have you heard about so and so.

Q: Did you perform this balancing in this case?

A: I would think more of what might have been produced and I think I had said that not just on cross-examination of witnesses. [ ] But by rebuttal witnesses.

[36]Petitioner argues that counsel's worries about opening the door on cross-examination and the presentation of rebuttal witnesses were unreasonable because negative information about Petitioner had come out earlier at the guilt stage of the trial. Apart from the point that the timing of when evidence comes in may be as important as the evidence itself, we make these points.

We note the Government, on appeal in response to questioning, pointed out two examples of evidence from the section 2255 hearing, not introduced at trial, which might have come out at sentencing: (1) Petitioner had given a .357 magnum handgun to his fifteen-year-old son, and (2) the testimony of a witness (Scottie Surrett)—kept out at the guilt phase by Petitioner's trial counsel—implicating Petitioner in the murder of a missing "dope stealer."

More important, Petitioner, who bears the burden in this case, never presented evidence that the fears of trial counsel about hurtful rebuttal witnesses were imaginary and baseless. For example, Petitioner's habeas counsel, at the evidentiary hearing, could have asked trial counsel precisely what trial counsel feared and why, but the questions were not asked. We must not just assume that defense counsel's worries were baseless. For all we know, trial counsel actually discussed this issue with his client; and the client informed him of potentially harmful witnesses or information.

Furthermore, even a competent trial lawyer may be unable to articulate exactly what cross-examination and rebuttal witnesses he fears because the scope of discovery in federal criminal cases is limited. *See, e.g., United States v. Fischel,* 686 F.2d 1082, 1090 (5th Cir.1982) ("Discovery in criminal cases is narrowly limited."). But the lack of articulation does not make his performance at trial incompetent. The fear of the unknown may, itself, be reasonable. For a defense lawyer to be a bit risk averse in a capital case is no indicator of incompetence. And recall in this case, trial counsel had (and did use) other mitigators; so, it was not a case of his having only one way to go. *Compare Williams,* 120 S.Ct. at 1514 (deeming counsel incompetent because failure to introduce voluminous mitigation evidence, even if it contained some unfavorable evidence about defendant's juvenile record, was unreasonable when only alternative was to rely on the mitigating value of a voluntary confession to brutal murder and when counsel's mistake of law impacted on the omission of other evidence).

excluding character witnesses from the sentencing phase, depends "critically" upon what information the client communicated to counsel. *Strickland,* 104 S.Ct. at 2066. In this case, Petitioner and trial counsel shrouded the conversations between themselves in attorney-client privilege;[37] so we do not know to what extent Petitioner informed trial counsel's acts.[38] Therefore, given the absence of evidence in the record, we

[37]Trial counsel censored himself; and given Petitioner's objections, the district court shielded the attorney-client conversations. At the 2255 hearing, the Government asked trial counsel if he had discussed Petitioner's arrest in Georgia with Petitioner. The following colloquy then occurred:

> [Trial Counsel]: I'm aware of Your Honor's order with reference to waiver of a confidentiality and this is not a—
>
> [Habeas Counsel]: Your Honor, I would, for the record object to going into any attorney/client conversations in light of the fact that we have not gone into any of those on the direct so I think it's beyond the scope of direct and I do not think that any of our examination touched on those issues *which would constitute a waiver of the attorney/client privilege.* Our examination dealt solely with his investigation with regard to other witnesses and with regard to specific particular witnesses. *Not anything with regard to conversations with his client. I haven't gone into that one whit. And I don't think I've waived the privilege in that regard* nor do I believe that it is within the scope of the direct examination.
>
> [U.S. Attorney]: Your Honor, the very basis of their allegations deal with what [trial counsel] knew or should have known at the time that this trial took place. And I think very clearly what his client told him or may have advised him concerning this information is relevant to cross-examination.
>
> ....
>
> The Court: I think this is going to be an area that on a situation by situation, case-by-case basis, we may have to make rulings.

> (Emphasis added). The district court then sustained habeas counsel's objection. And trial counsel, from the stand, at the end of this exchange told the judge: "I'm not raising an objection. I'm going to do what the court directs. But I want to be sure where we are. I think that there might be situations in which an answer to a question like that might implicitly indicate what was said."

[38]The judge disallowed the substance of conversations based on attorney-client privilege and said he would make further rulings on an instance-by-instance basis. Habeas counsel argues that he had only objected to issues outside of the scope of the hearing. We observe, however, that an objection was made and sustained on whether counsel discussed a piece of evidence with his client even though Petitioner was challenging trial counsel's failure to investigate sufficiently the author of this piece of evidence for trial. We also observe that trial counsel was careful himself not to touch on the conversations with his client. We find it troubling when a petitioner thinks he can meet his burden to show ineffectiveness even though he shielded and avoided pertinent conversations which would allow the courts to assess what trial counsel had learned

25

must assume counsel carried out his professional responsibility and discussed mitigation with his client.[39] *See Williams v. Head,* 185 F.3d 1223, 1235 (11th Cir.1999). In addition, the section 2255 transcript is clear on two points: trial counsel testified—without dispute—that he frequently met with Petitioner before and during trial and that no one who spoke with trial counsel ever came forward with facts about character evidence that he thought would be helpful.[40]

In short, trial counsel, based on his professional judgment as an experienced trial lawyer, determined (or some reasonable lawyer could have) that his client had a fair chance for acquittal, saw (or some reasonable lawyer could have) character witnesses—with the potential dangers associated with cross-examination and rebuttal witnesses—as less than compelling in mitigation, and allocated (or some reasonable lawyer could have) his time and resources accordingly. Trials are full of imponderables. Nothing in the record indicates with force that this lawyer's conduct was outside of the range of reasonable conduct.

---

from his client.

> Habeas counsel claims he did not shield Petitioner's conversations with the trial counsel about mitigation; habeas counsel says that no one asked about it. Even if habeas counsel had not raised an objection to shield the pertinent conversations, we stress he should have asked about them because Petitioner bears the burden of showing that trial counsel's acts were unreasonable. And, as *Strickland* says, what the client said and did is critical to that proof.

[39]The effect of attorney-client privilege was argued by the Government in its briefs, and both sides addressed this issue at oral argument. This issue was sufficiently argued, *see FSLIC v. Haralson,* 813 F.2d 370, 373 n. 3 (11th Cir.1987) ("briefs are read liberally to ascertain the issues raised on appeal"), especially considering that we make no new law on this issue, but merely apply the existing case law from this circuit.

[40]Trial counsel (without contradiction) testified: "what I was preparing to do was to try to defend the case and there was not volunteered at that—in any of that among the people I talked with or presented to me anything that I considered would be helpful on a sentencing phase." And "nobody had ever come forward and said such things [examples of good acts] and the only example of that type of thing that we had was in evidence." He stated further, "nothing was volunteered to me that I considered of value in there." *See generally Collins v. Francis,* 728 F.2d 1322, 1349 (11th Cir.1984) (counsel not ineffective for not investigating witnesses in mitigation when defendant failed to alert counsel to their existence). *See also Strickland,* 104 S.Ct. at 2066 *("[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.").*

26

When the guiding principles are applied to the record, the record will allow only one legal conclusion: Petitioner is due no relief.[41] In the light of the strong presumption that counsel was effective and

_____

[41]It certainly would have been less work for us to remand. And, we understand that appellate courts should not resolve genuine issues of disputed facts when those facts are material, *in the light of the applicable law,* to the outcome of the case; so, we do not do that. But, in our view, if we take seriously the principles that we have set out in this opinion, especially those dealing with objective reasonableness, no need for a remand arises. About remand, this principle of law is particularly important: We are not reviewing the quality of the specific lawyer's judgment processes that underlie his conduct at trial. (We must remember that *Strickland* passed through this court on its way to the Supreme Court and that some of our judges—who believed that the lawyer's performance in *Strickland* was inadequate under the Constitution—said they held that view because they were not convinced that the particular trial lawyer in that case had actually made a thought-out decision; the Supreme Court, however, determined the lawyer to be effective applying an objective standard. *Washington v. Strickland,* 693 F.2d 1243, 1283-84 (5th Cir. Unit B 1982) (en banc) (Johnson, J., concurring in part and dissenting in part), *rev'd by* 466 U.S. 668, 104 S.Ct. 2052, 2070-71, 80 L.Ed.2d 674 (1984).) We are reviewing the lawyer's conduct at trial and asking only whether some reasonable lawyer could have acted that way. In the light of the legal standards for lawyers' performance, we know enough to decide this case. We cannot honestly remand when, if the district court concluded that the trial lawyer's performance was deficient, we already know that we would reverse that judgment because it would be contrary to law, given the record.

The record in this case—even when read in Petitioner's favor—presents this legal question: Has a defendant proved his lawyer's performance to be deficient—that is, totally beyond the outside border of the "wide range" of reasonable performance—at sentencing when the defendant (with no prior criminal record) is convicted of procuring a murder and his lawyer has invested most of his time and energy in defending against conviction; when the evidence of guilt is not overwhelming, relying largely on the testimony of the actual killer who has told a variety of stories and who has been promised that he will not be executed; when defense counsel did present witnesses as well as other evidence in mitigation; when defense counsel did not present other character witnesses who would have testified to his past good works; when no one knows what instructions and information about the availability and use of character witnesses were supplied by defendant to defense counsel; when defense counsel has never said that the pertinent character witnesses would be compelling or that he would have used them; when nothing indicates that defense counsel's act in not presenting more character witnesses was caused by his having some erroneous view of the law; when defense counsel argued to the jury at sentencing that the evidence that defendant actually prompted the admitted killer to do the killing was in dispute (an argument that we say must be seen as a lingering-doubt argument given the context); when defense counsel stressed the lack of a criminal record for his client and that the actual killer would not be executed?

As we understand the law, we must conclude the answer is "no." Considering these circumstances, we believe that some lawyer could reasonably have not presented the character witnesses, although we also accept that other lawyers could reasonably have presented the witnesses.

To us, the basic disagreement in this case among the court's judges is not about facts—what happened, happened—but about law and what kinds of facts are legally important given the objective legal standard. In a less academic sense, our disagreement also reminds us that lawyers (for we are

27

the circumstances of the case, Petitioner has not met his heavy burden to prove that counsel's acts—at

sentencing, focusing largely on residual doubt and not investigating or presenting mitigating character

lawyers, too) can easily disagree on almost any point about how to proceed in a trial and that, because trying cases is no exact science, no level of skill or excellence can exist at which a trial lawyer (who has been unsuccessful in a case) can be removed from intelligent criticism in hindsight. There is no end to what might have been done differently.

28

witnesses—were unreasonable.[42] Nothing more needs to be said. The Constitution did not demand that trial counsel, in this case, use more character witnesses.[43]

CONCLUSION

---

[42]The district court, having concluded that no prejudice was proved in this case, did not specifically address whether counsel's performance was deficient. But no remand is required in this case given (1) the developed record complete with an evidentiary hearing (which Petitioner does not argue was inadequate and at which no one testified about what Petitioner had said to his trial counsel about the benefit and danger of using character witnesses), (2) the strong presumption that counsel's acts at trial were acts that a reasonable lawyer could have taken, and (3) the reality that Petitioner bears the heavy burden of proof on ineffectiveness. Remand is not required when the record is sufficiently developed and a "complete understanding of the issues is possible in the absence of separate findings." *Tejada v. Dugger,* 941 F.2d 1551, 1555 (11th Cir.1991) (considering habeas issue not addressed by district court); *see* Black, et al., *Federal Appellate Procedure—11th Circuit,* § 12:189 (1996) ("The trial court's failure to make necessary findings of fact constitutes harmless error when the facts necessary to the judgment have been incontestably demonstrated based on uncontroverted evidence."); *see also Strickland,* 104 S.Ct. at 2070-71 (Court applying different legal standard than applied by lower courts to record and declaring—without remand for more factfinding—defense counsel's conduct not to be ineffective), *rev'g,* 693 F.2d 1243 (5th Cir.1982) (en banc) (remanding to district court because more district court findings needed to reach conclusion on ineffective assistance issue); *Harich v. Dugger,* 844 F.2d 1464, 1470 (11th Cir.1988) (en banc) (deciding question of ineffectiveness without remanding for district court factfindings). And we note that, neither party, in the briefs, contended that the record is insufficient and requires remand.

Moreover, courts have decided ineffective assistance claims on direct appeal, without the benefit of district court factfinding. *See, e.g., United States v. Shukri,* 207 F.3d 412, 418 (7th Cir.2000) (denying ineffective assistance of counsel relief on direct appeal even though issue was not raised to district court below because both parties requested it and claim of incompetence could be rejected considering record of trial); *United States v. Fortson,* 194 F.3d 730, 736 (6th Cir.1999) (on direct appeal, deciding no deficient performance because record was adequately developed to allow the court to assess the merits of the issue, government did not contend that record was insufficient, court concluded further factual development was unnecessary and because court could "*conceive* of numerous reasonable strategic motives" for counsel's actions at trial (emphasis added)). And any alleged lack of evidence in this record necessitates neither a remand nor a ruling for Petitioner, but must be considered in the light of Petitioner's burden to overcome the presumption of competence, that is, to show ineffective assistance. *Cf. United States v. Montes-Mercado*, --- F.3d ---- (9th Cir.2000) (unpublished opinion) (refusing to conclude counsel ineffective for failing to provide reasons for his acts at the evidentiary hearing in part because petitioner never asked for an explanation); *United States v. Torres,* 845 F.2d 1165, 1172 (2d Cir.1988) (rejecting ineffective assistance claim, not considered by district court, as matter of law because proffered evidence of deficient performance did not "rise to the level necessary to overcome the strong presumption that counsel's performance was reasonable under [Strickland]").

[43]Never do we even hint that this course was either the best way or the only reasonable way to proceed in this case. To decide the constitutional question, we do not need to decide such things.

29

Petitioner's evidence was insufficient to prove that his trial counsel's acts were outside the wide range of professionally competent assistance. Thus, Petitioner has not met his burden under the law to prove ineffective assistance of counsel in this case. Because Petitioner cannot properly be granted relief, we affirm the district court's denial of the writ.[44]

AFFIRMED.

COX, Circuit Judge, specially concurring, in which DUBINA, BLACK, HULL and MARCUS, Circuit Judges, join:

I join Judge Edmondson's opinion in full. I write separately because I would also affirm the denial of Chandler's § 2255 petition because Chandler has not shown prejudice from his counsel's alleged deficient performance.

The district court assumed (without deciding) that Chandler's counsel's performance at sentencing had been deficient, but denied relief, concluding that Chandler had failed to establish prejudice. The district court's ultimate conclusion as to prejudice answers a mixed question of law and fact, and we review that conclusion de novo, but we review the district court's subsidiary factual findings only for clear error. *See Strickland v. Washington,* 466 U.S. 668, 698, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674 (1984).

The district court, after hearing the testimony of 27 character witnesses at the hearing on the ineffective assistance claim, found that the value of their testimony was severely undercut by three factors.

---

[44]About the question of prejudice, the court decides nothing. We need not. But several judges would be inclined to affirm on account of no prejudice, even if trial counsel's performance was deficient.

About today's dissenting opinions, we refrain from commenting, except that some of them bring to mind the words of Justice Jackson:

There has been much undiscriminating eulogy of dissenting opinions. It is said they clarify the issues. Often they do the exact opposite. The technique of the dissenter often is to exaggerate the holding of the Court beyond the meaning of the majority and then to blast away at the excess. So the poor lawyer with a similar case does not know whether the majority opinion meant what it seemed to say or what the minority said it meant.

Robert H. Jackson, *The Supreme Court in the American System of Government,* 18-19 (1995).

30

First, most of the character witnesses' knowledge of Chandler was "stale;" that is, their knowledge of Chandler's good character pre-dated Chandler's illegal activities, and the witnesses had little familiarity with him in the years leading up to the murder. Second, many witnesses also evidenced a lack of knowledge about Chandler's character by testifying that they were unaware that, as the jury heard, Chandler bought, grew, and sold large quantities of marijuana. Third, the district court found that most of the character witnesses exhibited a strong bias for Chandler because they testified that, even if Chandler had committed certain bad acts,[1] their opinions of Chandler would not have changed. As the district court found, "a witness's high opinion of Chandler would have been of little moment to the jury if the witness believed that drug dealing and violent crimes were irrelevant to a person's character." *United States v. Chandler,* 950 F.Supp. 1545, 1571 (N.D.Ala.1996). In summation, the district court found that "the mitigation evidence that Chandler's trial counsel could have offered was of tenuous value." *Id.*

The district court's findings about the value of this testimony are factual findings, subject to review only for clear error. A court's factual finding is clearly erroneous only if " 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *University of Georgia Athletic Assoc. v. Laite,* 756 F.2d 1535, 1543 (11th Cir.1985) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). The district court made findings about the value of this testimony after seeing and hearing the witnesses, and those findings have support in the record. I cannot conclude that those findings are clearly erroneous.

---

[1]These included:

> (1) Chandler's arrest in Georgia while attempting to purchase 100 pounds of marijuana;
>
> (2) Chandler's flight from Georgia Bureau of Investigation Agent Skinner and Chandler's attempt to turn Skinner's gun back on Skinner during a scuffle; and
>
> (3) Chandler's tape-recorded statement to a confidential informant that if he were "set up" again, he would have to kill someone.

Accordingly, in addressing the question of prejudice de novo, I give little weight to the character evidence that could have been introduced at sentencing. The ultimate question is whether Chandler has shown that any deficient performance prejudiced him such that, without the errors, there is a reasonable probability that the balance of aggravating and mitigating circumstances would have been different. *See Bolender v. Singletary,* 16 F.3d 1547, 1556-57 (11th Cir.1994) (citing *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064). Weighing anew the aggravating and mitigating factors, I note that the jury found two aggravating factors: (1) Chandler intentionally engaged in conduct intending that Shuler be killed and resulting in Shuler's death, 21 U.S.C. § 848(n)(1)(C); and (2) Chandler procured Shuler's killing by promising to pay something of pecuniary value, 21 U.S.C. § 848(n)(6).[2] The two statutory mitigating factors, admitted by stipulation,were that (1) Chandler had no prior criminal record, 21 U.S.C. § 848(m)(6); and (2) the triggerman would not receive the death penalty, 21 U.S.C. § 848(m)(8). Chandler's counsel also presented mitigating evidence in the testimony of Chandler's wife and mother at sentencing.

On balance, whether Chandler was prejudiced is, as the district court noted, a close question. The jury had convicted Chandler of a particularly egregious crime. It does not appear to me, given the strong aggravating factors, that the addition of weak character evidence would have tipped the balance in favor of mitigation. I conclude, therefore, that the district court was correct in its determination that Chandler has failed to establish prejudice, and would affirm on that ground as well.

TJOFLAT, Circuit Judge, concurring, in part, and dissenting, in part:

I.

The question before the en banc court is whether the district court erred in rejecting petitioner's claim that his lawyer, L. Drew Redden, rendered ineffective assistance of counsel in the sentencing phase of this case by failing to obtain evidence in mitigation of the death penalty and present it to the jury. The district

---

[2]The Government presented evidence that Chandler committed the murder after substantial planning and premeditation, 21 U.S.C. § 848(n)(8), but the jury rejected that factor.

court assumed that counsel's performance was constitutionally deficient; it nevertheless rejected petitioner's claim because, in the court's view, the mitigating evidence that Redden would have found (had he looked for it)[1] would not have prompted the jury to recommend a sentence of life imprisonment instead of death. *See United States v. Chandler,* 950 F.Supp. 1545, 1569 (N.D.Ala.1996) ("In fact, the Court is convinced that there is no reasonable probability that the result of the sentencing hearing would have been different if the proffered evidence had been presented."); *see also Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984) (To prove prejudice, the second prong of the Sixth Amendment test for ineffective assistance of counsel, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.").

A divided panel of this court vacated the district court's decision denying relief on petitioner's ineffective assistance of counsel claim, and remanded the case for resentencing. *See Chandler v. United States,* 193 F.3d 1297, 1310 (11th Cir.1999). It held that the mitigating evidence Redden should have uncovered, and which habeas counsel proffered to the district court in support of petitioner's application for relief under 28 U.S.C. § 2255 (Supp II.1996), if presented to the jury, would probably have made a difference in the outcome of the sentencing phase. *Id.* at 1308 ("[T]he quality and quantity of this evidence, almost all of which was available at the time of trial ... creates a reasonable probability that, but for counsel's failure to present even a small portion of this evidence, [petitioner] would not have received the death sentence.") (footnote omitted). In addition to deciding that petitioner had satisfied the prejudice prong of *Strickland* 's Sixth Amendment test, the panel also addressed the question of whether petitioner had satisfied the performance prong of that test. *See Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064 ("This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."). After examining the record, it concluded that Redden's performance in the

---

[1]The evidence Redden could have uncovered is the testimony petitioner's habeas counsel presented to the district court during the proceedings on petitioner's application for relief under 28 U.S.C. § 2255 (Supp II.1996).

sentencing phase failed that part of the test as a matter of law, and (after refusing to set aside petitioner's convictions) vacated his death sentence and ordered (assuming that the Government still wished to pursue a death sentence on the murder conviction) the district court to afford petitioner a new sentencing proceeding. *See Chandler,* 193 F.3d at 1310. Judge Edmondson, dissenting, did not address the question of whether petitioner had shown *Strickland* prejudice. Instead, he focused solely on Redden's performance, and, disagreeing with the panel's reading of the record, concluded as a matter of law that Redden's performance passed constitutional muster. *Id.* at 1315 (Edmondson, J., dissenting). Today, the court sitting en banc reaches the same conclusion and thus finds it unnecessary to remand the case to the district court for findings of fact and conclusions of law on the performance prong of *Strickland* 's test for ineffective assistance of counsel.[2]

I dissent because the material facts concerning Redden's investigation and presentation of mitigating evidence are in dispute.[3] An evidentiary hearing on an application for section 2255 relief is, in all respects, a bench trial; the tasks of resolving the conflicts in the testimony, finding the facts, and then weighing such facts and according them their appropriate weight under the applicable rule of law is assigned to the district court.[4] In this case, the court of appeals has put aside institutional tradition and taken over the district court's

---

[2]It is not disputed that Redden failed to look for mitigating evidence for use in the sentencing phase of petitioner's trial (except two circumstances, to which the Government stipulated, that petitioner lacked a substantial criminal history and that someone equally culpable would not be receiving a death sentence). Therefore, when the sentencing phase arrived, Redden had nothing to present to the jury except the testimony of two witnesses, whose testimony he did not anticipate until an hour or so before the sentencing phase began. The majority holds that Redden's failure to look for mitigating evidence and his performance during the sentencing phase passed Sixth Amendment muster because four years later the district court, in ruling on petitioner's motion for section 2255 habeas relief, concluded that Redden's failure to call any, or all, of the witnesses that habeas counsel were able to uncover caused petitioner no prejudice. In other words, the majority's holding today is: counsel's failure to seek mitigating evidence constitutes competent performance, if, on habeas corpus, it appears that the petitioner cannot satisfy *Strickland* 's prejudice prong.

[3]At the same time, I concur in the court's disposition of petitioner's remaining claims for section 2255 relief.

[4]It cannot be disputed that the fact-finding function lies with the district court. *See United States v. Griffin,* 699 F.2d 1102, 1108 & n. 14 (11th Cir.1983). In *Griffin,* this court explained, in a footnote, why it

role. On a cold record from which various inferences of fact can reasonably be drawn—some in favor of petitioner, some in favor of the Government—the court has judged the demeanor of the witnesses, determined their credibility, found and weighed the facts, and then, applying *Strickland* 's performance standard, has concluded that Redden discharged his Sixth Amendment duty to petitioner. I have searched in vain for a habeas proceeding—especially in a capital case—whether brought under 28 U.S.C. § 2254 or § 2255, in which a United States Court of Appeals took it upon itself to resolve the issues of fact rather than remanding the fact-finding task to the district court, which previously had held an evidentiary hearing, heard from witnesses on both sides of the case, and observed their demeanor.[5]

---

is procedurally improper for an appellate court to decide a claim when the underlying facts have not been found by the district court:

> If an appellate court elects to consider the issue and study the record on appeal in relation to it, an assertion of ineffective assistance may appear totally without merit in light of that record. The temptation is strong in such instances to go ahead and decide the issue against appellant on the presumption that doing so will reduce the workload of the district court. Succumbing to the temptation, however (1) adds unnecessarily to the workload of the appellate court; (2) may be fruitless, where the appellant would not have elected to present the issue to the district court under 28 U.S.C. § 2255; (3) may deny appellant an opportunity to develop the issue on a proper record; (4) encourages future first-time presentations on appeal; and most importantly; (5) undercuts everything the courts ... have said against its presentation for the first time on direct appeal.

*Griffin,* 699 F.2d at 1108-09 n. 14. *See generally Gulf Power Co. v. United States,* 187 F.3d 1324, 1334 (11th Cir.1999) ("To be sure, an appellate court is not the usual forum in which factual issues ... are resolved....").

[5]There may be occasions, as in a case whose appropriate disposition turns on documentary or other tangible evidence, where the material facts are so clear and settled that a remand for fact-finding is unnecessary; this, however, is not such an occasion. *See, e.g., Jackson v. Leonardo,* 162 F.3d 81, 86 (2d Cir.1998) (stating that the usual practice is to remand, but that remand "might not be necessary in a highly unusual case where no plausible explanation for an attorney's actions exists"); *United States v. Gaviria,* 116 F.3d 1498, 1512 (D.C.Cir.1997) (stating that remand is the normal practice unless "the trial record alone conclusively shows that the defendant is entitled to no relief and when the record conclusively shows the contrary") (internal quotation marks omitted).

> To support its proposition that it is within the province of a court of appeals to resolve issues of fact in a case where the district court held an evidentiary hearing but failed to find the facts, the majority cites several cases. None of them, however, stands for the majority's proposition. In *United States v. Shukri,* 207 F.3d 412 (7th Cir.2000), the Seventh Circuit disposed of the defendant's claims

of ineffective assistance of counsel in *the defendant's direct appeal from his convictions* for conspiring to possess and possession of stolen property. The claims, which had not been presented to the district court, were that (1) counsel failed to cite *United States v. Garcia,* 897 F.2d 1413 (7th Cir.1990), in support of his motion *in limine* to suppress certain out-of-court statements the prosecution intended to introduce as having been made against the witness' penal interest; (2) counsel failed to renew his objection to the statements at trial, when it presumably became apparent that the statements had not been made against the witness' penal interest; and (3) counsel failed to object to questions the prosecutor put to the defendant on cross examination. *Shukri,* 207 F.3d at 418-19. In his brief, the defendant cited as district court error the court's denial of the motion *in limine.* The Seventh Circuit found no error, much less an abuse of discretion, in the district court's denial of the motion *in limine* or its admission of the statements into evidence at trial; therefore, the defendant's claim that his attorney's performance was constitutionally defective was patently meritless. *Id.* at 419. The same was true regarding the defendant's third point; the questions the prosecutor asked the defendant on cross examination were appropriate. *Id.* The court of appeals disposed of the defendant's ineffective assistance claims because the trial court record conclusively showed that, even if the defendant was given an evidentiary hearing in a section 2255 proceeding (brought following the affirmance of his conviction), he could not possibly establish either prong of *Strickland* 's standard for ineffective assistance. *Id.* at 419.

In *United States v. Fortson,* 194 F.3d 730, 736 (6th Cir.1999), *another direct appeal from the defendant's convictions,* the Sixth Circuit entertained the defendant's challenge to his attorney's performance at trial. In that case, the defendant, Fortson, a Michigan resident, was charged with four other gentlemen for conspiring to transport cocaine from New York to Michigan. *Id.* at 733. Fortson's co-conspirators brought eight kilograms of cocaine to Michigan in a van; when they arrived, the local police, who had been monitoring the activities of one of the co-conspirators, Paulino, spotted the van, and followed it and a Camry sedan, driven by Fortson, which was traveling in front of the van. *Id.* When it appeared that the occupants of the van and the Camry were working together, the police stopped the van, and searched it, finding the cocaine. *Id.* Moments later, the police approached the Camry, which was parked in an adjacent lot, and arrested Fortson, Paulino, and a co-conspirator. *Id.* at 734. At his trial, Fortson's defense was that, even though he had been arrested at the scene of the crime, the jury should acquit him because all that the evidence showed was "mere presence." *Id.* The jury, of course, rejected his "mere presence" defense. In his brief on appeal, in addition to challenging the sufficiency of the evidence, Fortson alleged that his trial attorney's performance had been constitutionally deficient because he had not "introduced evidence demonstrating Paulino's ties to the state of Michigan." *Id.* at 736. He did not explain, however, how evidence of Paulino's ties to Michigan would have established his "mere presence" defense. The Sixth Circuit, concluding that the evidence was more than sufficient to convict, made an exception to its rule that ineffective assistance of counsel claims are not to be heard on direct appeal and decided to address Fortson's ineffective assistance claim because the record conclusively demonstrated that the claim had no merit. *Id.*

*United States v. Torres,* 845 F.2d 1165, 1167, 1172 (2d Cir.1988), another drug case, is likewise a case in which the challenged actions of counsel were clearly established in the trial record, so that the court of appeals was confident that it could decide the ineffective assistance of counsel claim *while reviewing the defendant's conviction on direct appeal.* Torres and two accomplices were arrested at the conclusion of a drug transaction involving two kilograms of cocaine. In searching Torres at the scene, a DEA agent found $3,871 on his person. *Id.* at 1168. In his brief on appeal,

Judge Barkett's dissent, after canvassing the evidence relating to Redden's performance, shows quite convincingly why petitioner has satisfied the first prong of *Strickland* 's test.  I agree with her dissent's analysis of the evidence, but I disagree that the dispositive issue can, and should, be decided by this court in the first instance.  If nothing else, that the judges of this court are fairly split on whether the historical facts

Torres claimed that he was denied the effective assistance of counsel because, prior to trial, his attorney failed to move to suppress money the agent had seized and, at trial, failed to request a missing witness instruction, so that the jury would understand why a confidential informant had not been called as a defense witness.  *Id.* at 1172.  It was obvious that counsel's performance fell clearly within the range of what any court would consider adequate performance, and the Second Circuit therefore rejected Torres' ineffective assistance claim out of hand.

Next, *Bonin v. Calderon,* 59 F.3d 815, 822-23 (9th Cir.1995), involving two 28 U.S.C. § 2254 (1994 & Supp. II 1996) petitions challenging sixteen murder convictions in two counties (Los Angeles and Orange), provides absolutely no support for the majority's proposition.  In *Bonin,* the district court held a three-day evidentiary hearing and made comprehensive findings of fact and conclusions of law in disposing of the petitioner's ineffective assistance of counsel claim.  *Id.* at 823 (9th Cir.1995) ("In separate published opinions, the district court denied both of Bonin's petitions.") (citing *Bonin v. Vasquez,* 807 F.Supp. 589 (C.D.Cal.1992) and *Bonin v. Vasquez,* 794 F.Supp. 957 (C.D.Cal.1992)).  *United States v. Montes-Mercado,* No. 99-15282, --- F.3d ---- (9th Cir. May 15, 2000) (unpublished), a section 2255 proceeding in which the petitioner's ineffective assistance claim was that counsel should have advised petitioner that he could plead guilty, but still maintain his innocence, is equally unhelpful to the majority.  Putting aside the question whether we should rely on an unpublished opinion from a sister circuit, we note that, unlike the situation in the instant case, the district court held an evidentiary hearing and made findings of fact in rejecting the petitioner's claim.

Finally, the majority relies on two Supreme Court cases, *Roe v. Flores-Ortega,* --- U.S. ----, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000), and *Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), for the proposition that it is appropriate for a court of appeals to make findings of fact in the absence of findings made by the court that originally entertained the ineffective assistance of counsel claim.  In *Roe,* the Court emphasized that the deficient performance inquiry is a fact-intensive one, the determination of which requires "courts ... [to] take into account all the information counsel knew or should have known." *Roe,* 120 S.Ct. at 1036.  Because the "Magistrate Judge's findings d[id] not provide [the Court] with sufficient information to determine whether Ms. Kops rendered constitutionally inadequate assistance," *id.* at 1040, the Court vacated the court of appeals decision and remanded the case.  In *Darden,* the district court held an evidentiary hearing and made findings of fact;  the Court cites to the habeas proceeding, *Darden,* 477 U.S. at 184, 106 S.Ct. at 2473, and concludes that "[w]e agree with both the District Court and the Court of Appeals that petitioner was not deprived of the effective assistance of counsel." *id.* at 187, 106 S.Ct. at 2474.

In sum, I am simply at a loss as to how any of the cases cited above could be considered supportive of the majority's proposition that a court of appeals should assume the district court's fact-finding role in a case of this magnitude.

demonstrate ineffective assistance of counsel highlights the necessity of remanding the issue to the district court.

The majority concludes that Redden provided effective assistance as a matter of law.[6] Because the district court made no findings of historical fact on his performance in the sentencing phase of the case, the majority, in order to hold that petitioner failed to show that Redden's performance was deficient, must view the evidence in the light most favorable to petitioner.[7] In this dissent, I also consider the evidence in that light, and then lay out the facts that a reasonable fact finder could find by a preponderance of the evidence.

Before doing so, however, I deem it necessary to comment on the majority's strong reliance on the "presumption" that defense attorneys are acting competently, in the Sixth Amendment sense, when they make strategic choices,[8] and to consider the time frame in which Redden prepared petitioner's case for trial, a time frame the majority opinion fails to mention.

A.

According to the majority, the Supreme Court and this court have established certain "principles and presumptions" relating to ineffective assistance of counsel claims. One such presumption is that counsel's

---

[6]The majority draws this conclusion without acknowledging the full import of the Supreme Court's recent decision in *Williams v. Taylor,* --- U.S. ----, 120 S.Ct. 1495, 1514-15, 146 L.Ed.2d 389 (2000). As Judge Barkett's dissent explains, the majority's analysis of Redden's "strategic choice" to forego any investigation into the petitioner's background in an effort to find mitigating evidence cannot be squared with the Court's holding in *Williams.*

[7]Absent findings of fact by the district court, this court is in the same position it would occupy in reviewing a summary judgment, a judgment as a matter of law, or a judgment entered following a bench trial without the findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a) (as occurred in the instant case). In conducting such reviews, we consider the evidence, and the inferences it yields, in the light most favorable to the nonmovant. In the case at hand, petitioner is, for our purposes, the nonmovant. Although the majority opinion does not indicate that, in assessing Redden's performance, the court viewed the evidence in the light most favorable to the petitioner, I must assume that it did.

[8]The majority opinion cites this presumption at least eleven times, *ante* at 3043 n. 14, 3044 n. 15, 3045-46, 3046, 3048 n. 23, 3049, 3053, and 3054. In footnote 15, *ante,* the majority seems to agree with the proper definition of a presumption; therefore, I do not understand how it can continue to assert that we should presume that defense counsel acted reasonably.

38

strategic choices are competent.  In a post-conviction proceeding in which the petitioner is claiming that his lawyer rendered ineffective assistance, however, this "strategic choice" presumption has no legal effect.  In other words, it does not operate as a presumption.

Federal Rule of Evidence 301 explains how a presumption operates in a case such as the one before us:

> In all civil actions and proceedings not otherwise provided for by Act of Congress or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast.

*See also* Fed.R.Evid. 301 advisory committee's note ("[W]hile evidence of facts giving rise to a presumption shifts the burden of coming forward with evidence to rebut or meet the presumption, it does not shift the burden of persuasion on the existence of the presumed facts.  The burden of persuasion remains on the party to whom it is allocated ... in the first instance.").  A Rule 301 presumption is the same as a presumption at common law.  Like its common law antecedent, a Rule 301 presumption is a device that aids the party with the burden of proof in establishing the elements of its claim.  (Or, on the defendant's side of the case, a presumption may aid in establishing the elements of an affirmative defense.)  A presumption is invoked when a party's adversary possesses evidence that is essential to the claim (or affirmative defense) but is, as a practical matter, unavailable to all but the adversary.

In giving petitioner's adversary, the Government, the benefit of the "strategic choice" presumption, the majority apparently overlooks the fact that the Government needs no assistance in this case.  The Government does not bear the burden of establishing Redden's competence;  to the contrary, it is petitioner's burden to establish Redden's *in* competence.[9]  In sum, the "strategic choice" presumption is not a presumption

---

[9]For the same reason, the principle that a defendant is "presumed" innocent until proven guilty beyond a reasonable doubt does not express a presumption in the Rule 301/common law sense.  That the defendant is presumed innocent is merely a way of saying that the prosecution has the burden of proof on the issue of the defendant's guilt.

in the Rule 301/common law sense. It is simply a short-hand way of saying that petitioner has the burden of proof on the issue of the constitutional adequacy of his attorney's performance.[10]

B.

The period of time during which Redden performed his service in the trial court—from the day he undertook petitioner's representation to the day the jury recommended the death penalty—was relatively short. The petitioner retained Redden early in January 1991 (the record does not disclose the precise date of Redden's employment). Petitioner and fifteen others had been under indictment in the Northern District of Alabama on a charge of conspiring to traffic marijuana, and the grand jury was in the process of returning a ten-count superceding indictment that alleged a massive continuing criminal enterprise that spanned a period of three years, 1987-1990, and included the murder charge that led to the death sentence now under consideration. The grand jury returned the superceding indictment on January 9; Redden appeared for petitioner at his arraignment the next day. On January 24, the district court entered an order fixing February 12 as the trial date. Six days later, on January 30, the prosecutor formally notified petitioner, and Redden, that the Government would be seeking the death penalty on the murder count. On February 1, the district court severed petitioner's case from the cases against the other (fifteen) defendants; their trial would commence on February 12 as scheduled, and petitioner's trial would begin on March 12. Because Redden had previously committed himself to attending the annual convention of the International Society of Barristers in London in the first week of March, he moved the court to set another trial date. The court granted his request and scheduled petitioner's trial for March 19.

Recapitulating, I conclude that, excluding the time Redden would spend attending the Barristers' convention, from the day the prosecutor notified him that the Government would seek the death penalty until

---

[10]A final observation about the "strategic choice" presumption the majority invokes: even if the law were to accord it the status of a Rule 301 presumption, it would not yield an inference that Redden acted competently in making the strategic choice at issue. An inference has probative value. A presumption does not. It simply shifts the burden of going forward with the evidence; once rebutted, it disappears from the scene.

the day petitioner's trial would (and did) begin, he had forty days, weekends included, in which to prepare for trial. During that time, he or his paralegal, Suzanne Brotherton, or both, attended the February 12 trial of petitioner's co-defendants, which lasted six days, and interviewed nearly sixty-seven witnesses; some of the witnesses were interviewed initially, or were re-interviewed, during petitioner's trial. Most of the interviews took place in or around Piedmont, Alabama, in Calhoun County, a two hour drive from Birmingham, where Redden's law firm had its office.

The guilt phase of petitioner's trial began as scheduled on March 19, 1991. The Government called over forty witnesses. Nine days later, on March 28, the Government rested. In his defense (in the guilt phase), petitioner called twelve witnesses, but did not take the stand himself.[11] The parties' closing arguments took place on April 1. The court charged the jury the following morning, and at 10:25 a.m., the jury retired to deliberate. At 1:50 p.m., after three and a half hours of deliberation, the jury reached a verdict; it found petitioner guilty on the nine counts of the indictment in which he had been named as a defendant. The court then asked the clerk to poll the jury; the poll indicated a unanimous verdict, and the jury was dismissed until 9:00 a.m. the next day, at which time the sentencing phase of the trial of the murder count would begin. Once the jurors had left the courtroom, the court informed counsel that it wished to discuss what they intended to do in the sentencing phase of the trial. Redden stated that he would prefer that the discussion take place in chambers. The court agreed, and declared a half-hour recess.

At 2:30 p.m., the court and counsel met in chambers in the presence of a court reporter who took down and transcribed the entire proceeding. The court began the discussion by outlining the sentencing phase of the trial. That phase would begin with the court instructing the jury on its sentencing role and how the proceedings would be conducted. Thereafter, the prosecution and the defense would make opening statements; the Government would present evidence of aggravating circumstances; the defendant would be afforded the opportunity to put on evidence of mitigating circumstances; the Government and the defendant

---

[11]Petitioner also called one witness in surrebuttal.

would present their closing arguments; and the court would charge the jury. Regarding mitigating evidence, the court told Redden that the "world is open" to the defendant; he has the right to introduce any evidence that might mitigate the sentence.

The court asked the prosecutor and Redden how long it would take to present their evidence. The prosecutor stated that the Government would stand on the record of the guilt phase and offer nothing further. Redden said that his presentation of the defense "won't be long ... less than a day." He stated that the defense would rely on two statutory mitigating circumstances, which the Government did not dispute. These were (1) that petitioner had no "substantial criminal record," and (2) that Charles Ray Jarrell, who was as responsible as petitioner for Shuler's death and had plead guilty to the marijuana conspiracy charge, would not be receiving a death sentence. Redden was non-committal concerning the witnesses, if any, he might call, although he did ask the court for a ruling *in limine* as to the scope of the prosecutor's cross-examination of petitioner's wife if he called her as a witness. Finally, the court and counsel discussed the instructions the court planned to give the jury and the verdict form. The record does not indicate how long the court-counsel chambers conference lasted. Although the clerk's docket sheet and the court reporter's transcript reveal that the conference began at 2:30 p.m., neither reveal when it ended. The transcript consists of twenty-nine pages; hence, drawing purely on experience, I estimate that the conference lasted twenty-five to thirty minutes.

With the foregoing time frames in mind, I turn to the facts a reasonable fact finder could find from the evidence when that evidence is considered in the light most favorable to petitioner. Stated another way, I review what the evidence, when considered in that light, tells us about Redden's investigation of mitigating evidence and his decision to limit petitioner's case to the two undisputed statutory mitigating circumstances cited above and the testimony of petitioner's wife, Deborah Chandler, and his mother, Irene Chandler.

II.

The evidence bearing on petitioner's claim that Redden rendered ineffective performance by failing to seek mitigating evidence and present it to the jury comes from four sources: (1) the testimony of Redden

42

and petitioner's wife, Deborah Chandler, adduced during the section 2255 evidentiary hearing concerning Redden's efforts to obtain favorable character witnesses;  (2) the testimony of the twenty-seven witnesses called to the stand by habeas counsel during that proceeding to expound on petitioner's character and to relate specific instances of petitioner's charity toward others;  (3) the pre-trial and trial time tables I have set out above;  and (4) Redden's opening statement and closing argument made to the jury at the sentencing phase of the trial.  If this evidence is viewed in the light most favorable to petitioner—which means that he receives the benefit of the doubt on all credibility and fact issues—a reasonable fact finder would be justified in giving little, if any, credence to what Redden had to say, with the exception of the statements that support petitioner's claim.  I say this because Redden's testimony, as indicated in the margin,[12] is riddled with "I don't

---

[12]The following passages are from Redden's testimony during the section 2255 proceeding:

- In response to when he entered a notice of appearance in the case, Redden stated "Well, I don't—I don't have any recollection of that act.  I'm sure I did it."

- Responding to a question about when he received notice of the Government's intent to seek the death penalty, Redden said, "I recall that subject.  I do not recall the precise date."

- Regarding severance of Chandler's trial, he stated "I don't know what the Government's position was.  I don't recall what it was."

- When asked why he sought a one-week continuance, Redden replied "It was that I had prior to being retained in this case committed myself by word and by money to attend the Convention of the International Society of Barristers that was to be held probably the first week in March, I've forgotten."

- When asked if he thought about requesting a continuance before the sentencing phase, Redden stated "I don't think I did."

- When asked whether the court would have granted a continuance, Redden said "I don't know whether it would have been or not."

- When trying to recall when petitioner was arrested, Redden said "I believe, [he] had been arrested probably in around September, I'm not sure...."

- When asked if he knew that section 848(q) of the Anti-Drug Act provided resources for an investigator (whom he chose not to hire), Redden stated "I'm not sure whether I knew that at the time or not, but I knew I was retained counsel and I figured that [hiring an investigator] would be my obligation."

43

know," or "I don't recall," or "I don't have any recollection," or "I have forgot- ten."[13]   Giving

- When asked whether he remembered the jury asking to listen a second time to a tape recording in which petitioner said he'd have to kill somebody, Redden said "I don't recall."

- When asked if the sentencing hearing was set for the day after the jury's verdict (finding petitioner guilty of murder and eight other offenses) was announced, Redden said "Set it for the next day.  I don't—I don't know the time."

- When asked what he did after the verdict came in to find some additional character witnesses, Redden replied "I know that I made the request of [Deborah] Chandler and whether other family members, I don't know, and whether we had earlier had such conversations, I don't know."  Then petitioner's habeas counsel said, "All right.  You don't recall?" and Redden responded, "No."

- In response to a question about what he told Deborah Chandler on April 2 about the kind of evidence they needed to put on in mitigation the next day, Redden said "I don't recall what I told her or what she might have been told by Suzanne [Brotherton, his paralegal], except that it would be things that would demonstrate humanity, compassion, things of that sort."

- When asked if he asked any family members besides Deborah Chandler to find mitigation witnesses, Redden replied "That I'm not sure of."

- Regarding when he prepared Deborah and Irene Chandler to testify at sentencing, Redden said "We talked probably some that afternoon, I'm not sure, and probably in the morning."  When post-conviction counsel tried to be more specific, asking "[s]o it would have been after—sometime after 2:30 before you talked to her?"  Redden replied "It might have been.  I don't recall now."

- When asked if he remembered asking the court to bring petitioner in at 8:00 a.m. on the day the sentencing proceeding was to begin, Redden said "I think that happened.  I don't remember it."

- In response to a question about if he knew what Deborah Chandler's and Irene Chandler's answers would be to the questions he would ask them before the jury, Redden said "I don't think so."

- When asked if he knew that the sentencing hearing lasted less than an hour, Redden said "I don't know."

- When the prosecutor asked Redden if he knew how many witnesses he talked to, Redden said "No, except as she [his paralegal, Brotherton] has advised me of a number that looked as if we had was 67."

- When asked by the prosecutor why he did not call Reverend McCoy as a mitigation character witness, Redden said "[t]hey came with—there was a minister who came that I made the decision not to use for the reason that he had been out of the community for a period of time, and as I recall—I've forgotten, you know, the contact was not a current thing and I felt that in the absence of some number of witnesses that that would not be a wise thing to do."

- When asked if he knew which of the 67 witnesses he and/or his paralegal, Brotherton, interviewed were interviewed prior to trial or during trial, Redden said "No. Of course, there was some that would have been in both categories."

44

Redden's testimony its due weight and considering the rest of the evidence, a reasonable fact finder could find the following facts:

— Redden did not look for mitigating evidence or even give the matter serious thought until after the jury returned its verdict at the conclusion of the guilt phase of the trial.[14]

— After the jury returned its verdict at the conclusion of the guilt phase of the case, Redden determined as a matter of sound trial strategy that mitigating evidence would be necessary. Having made no investigation, or other inquiry, into petitioner's background, however, he had no idea of the sort of mitigating evidence that might be available.[15]

---

[13]The majority states, *ante* at nn. 27 & 41, that it is not "accepting that [Redden's] words represent his heartfelt views, that [it] is not crediting his testimony as absolutely true" or reviewing "the quality of the specific lawyer's judgment process that underlie his conduct at trial;" rather, the majority accepts Redden's testimony as "illustrating the kinds of thoughts some lawyer in the circumstances could—we conclude—reasonably have had." It seems to me that in determining whether a defense attorney provided ineffective assistance of counsel, what the attorney did, and why he did it, is important. The majority seems to be disregarding what Redden did, and why he did it; instead, imagining what a hypothetical lawyer would have done under the circumstances. I am unfamiliar with such an approach, which to me is quite novel, to the resolution of ineffective assistance claims.

[14]All of the 27 character witnesses who testified during the hearing on petitioner's ineffective assistance claim stated that neither Redden nor anyone acting in his behalf contacted them *at any time* about testifying in petitioner's behalf at the sentencing phase of the trial. All of them also stated that they would have been available to testify and would have done so if called. Deborah Chandler testified that the first time Redden mentioned the subject of mitigating evidence was after the jury returned its verdict on the afternoon of April 2.

[15]In his opening statement to the jury at the sentencing phase of trial, Redden described the mitigating evidence he would present as follows:

Mitigating circumstances may include any of those mitigating circumstances that are identified by statute and may include also anything else, any other circumstance that any juror wants to consider in mitigation. And by mitigation, we simply mean as tending to indicate to you that you should not recommend a death penalty.

... [A]mong the statutory mitigating factors that the Court will identify to you are two at least that are very important in this case.

One is—and this is in the statute for a jury to consider—that the defendant on trial has no, as the statute says, "substantial criminal record." And we expect that to be demonstrated very clearly in this hearing, that that is true of David Ronald Chandler.

Also, that another person or persons who participated in the killing of Marlin Shuler, which has been found, is not receiving and is not undertaken to receive the capital penalty. I think that's already been demonstrated by the evidence in this case that that certainly is true

45

— Redden delegated to Deborah Chandler the task of finding witnesses who could portray petitioner's character in a favorable light. He did so without asking her who might be available to testify or explaining the kinds of persons she should contact. Moreover, Redden knew that she was visibly shaken and distraught over the jury's verdict and in no condition to carry out the task he had assigned her.[16]

---

> with reference to the man that killed Marlin Shuler, Charles Ray Jarrell, Sr. But it will be demonstrated conclusively to you again in the course of this hearing.

Then, in his closing argument at the sentencing phase, Redden contended that the mitigation evidence he had presented showed that a sentence of death was inappropriate for Chandler's crime. Specifically, he argued that,

> Now, certainly we would argue and we do argue that there are two very clear mitigating circumstances in this case. One is the absence of any substantial criminal record, as the statute says, "mitigating factors." Number six, the defendant did not have a significant prior criminal record. And that stipulation which is in evidence is proof without contradiction that that is the case.

> Another is that another defendant or defendants equally culpable in the crime will not be punished by death. You can go further than that, not be punished at all, will not even be tried under an accusation of the murder of Marlin Shuler. Those two things. Well, what else mitigates.

> Well, for one thing, the testimony of his mother and of his wife was not here for a tear-jerking purpose. It was here to show that there was a life here that has had a stability to it, that has had some quality to it and I think that is apparent when you looked at those two ladies, contrasted to the character or nature of some of the people who testified in this case and it stands out in stark contrast and the fact that here is a family that had tremendous stability, here is a man who not to have lived around with this person, that person and the other. He's got three children, they are all by his wife. Here is a man who apparently has some skill of his hands who has worked in building his house and his parents' house, his brother's houses and they've worked with him and this springs off the 80-acre farm that his father had with his father, way back. They built a sawmill, they cut trees, they made lumber, they collected rocks, they built houses and lives demonstrating lives with some purpose as opposed to life worthless. So that that is a mitigating factor that I think that you have certainly not just the right but the obligation to consider.

A reasonable fact finder could find from these portions of Redden's opening statement and closing argument that Redden thought that mitigating evidence would be necessary if the jury was to spare petitioner's life.

---

[16]After Redden spoke to Deborah Chandler about the need for witnesses to testify for petitioner, she left the courthouse with members of her family and some friends (all from Piedmont) and drove to Piedmont. Someone else drove the car because, in her words, she was "numb" and was having difficulty functioning. Foremost in her mind was what she would tell her three children, the oldest of which was sixteen, about the day's events.

46

— Notwithstanding these circumstances, Redden did not consider explaining his predicament to the district court and requesting a continuance. He could have done so during or following the chambers conference with the court on the afternoon of April 2, or before the sentencing phase of the trial began at 9:00 a.m. the next day.[17]

The notion, expressed by the majority, that Redden did not call character witnesses like those found

by habeas counsel because he had "misgivings" about what the prosecutor might be able to bring out on

_____

The trip to Piedmont took two and a half to three hours because they had to detour to drop some of the people off; thus, they arrived home somewhere between 4:45 p.m. to 5:15 p.m. Family members concerned about Deborah's condition summoned Rita Smith, a fellow member of Piedmont Church of God, to stay with her. Several well-wishers stayed and prayed with Deborah throughout the night. At some point during the evening, Deborah's sister-in-law reminded her that "they were supposed to get somebody to stand up for Ronnie tomorrow." Rita Smith thought of Reverend McCoy, who had been the pastor of Piedmont Church of God from 1975 to 1981. McCoy, who lived in Piedmont, said he would testify, and came to Birmingham the next day for that purpose.

On the morning of April 3, between 8:00 a.m. and 9:00 a.m., Redden met for a "few minutes" with petitioner, Deborah Chandler, Irene Chandler, and Reverend McCoy. At 9:00 a.m., the sentencing phase of the trial began. Redden called Deborah and Irene to the stand, and they testified as indicated in Judge Barkett's dissenting opinion.

[17]During the chambers conference, after the court told Redden that "the world [was] open to him," Redden could have—indeed, should have—informed the court that he had done nothing to prepare for the penalty phase of the case. First, and foremost, his client's life was at stake. Even though Redden had satisfied his constitutional obligation to provide petitioner competent representation during the guilt phase of the case, Redden had an ethical obligation to cast petitioner's character in the best possible light at the sentencing phase of the trial. Second, as a highly experienced criminal defense attorney, Redden knew that, if the jury recommended a death sentence and petitioner was sentenced to death (1) petitioner would seek relief from the sentence under 28 U.S.C. § 2255 on the ground that Redden had denied him effective assistance in the sentencing phase of the trial, and (2) Redden would be back in court before the same district judge and interrogated under oath as to why he did not seek a continuance in order to prepare the sort of mitigation evidence petitioner's habeas counsel was able to uncover in the span of a few days.

Habeas counsel, after receiving two weeks notice of the evidentiary hearing the district court would hold on petitioner's claim of ineffective assistance of counsel, met with Deborah Chandler, explained the role of a mitigation witness, and asked her to assemble a group of people who would have been available to testify in petitioner's behalf during the sentencing phase of the trial. On a Sunday afternoon, after church, fifty or so people gathered at Irene Chandler's house for a meeting with habeas counsel. Of this group, nearly all, forty to fifty, came to the evidentiary hearing in the district court. After hearing the testimony of 27 of these witnesses, the district court stated that it had heard enough; it held that the testimony of the remaining mitigation witnesses would simply be cumulative and therefore would be unnecessary.

47

cross-examination, *ante* at 3051, has no foundation in the record.[18] First, since Redden had no idea as to who might be able to testify for petitioner, he could not have had misgivings about what a particular witness might say on cross-examination. Second, other than his belief that the Piedmont "law enforcement community" was

---

[18]The majority draws its "misgivings" conclusion from the following exchange that took place between Redden and the prosecutor at the evidentiary hearing on petitioner's ineffective assistance claim:

> Q: You're also aware, were you not, that by calling character witnesses for Mr. Chandler you would have opened them up to cross-examination by the government, would you not?
>
> A: Yes, sir.
>
> Q: Were there some aspects of that that you believed might not have been helpful to your case?
>
> A. Certainly.
>
> Q: In fact, you knew or had some information that some individuals in the community considered Ronald Chandler to be a drug dealer, did you not?
>
> A: Yes.
>
> Q: And some information that there were people in the community that were afraid of him?
>
> A: Not as much of that. I had heard that, but that was—I don't know how many people would come and say that as opposed to the other.
>
> Q: You knew that was certainly available to the government or could be available to the government as cross-examination material?
>
> A: Well, I felt that the law enforcement community in Piedmont, in that part of the county, was hostile to him, antagonistic to him. And that they certainly could have produced witnesses of that sort.

Immediately after this exchange, Redden clarified that his real concern was not what the prosecutor might bring out on cross-examination, but that the jury, by finding petitioner guilty, had already set its mind against the petitioner such that nothing would convince it not to recommend death:

> And so I felt that, to answer your question, that it would be at least questionable whether a sufficient impact of character type testimony could overcome a fixed opinion based on the other evidence, if they had such a fixed opinion, and could change it from life to death. Or death to life.

48

"hostile" toward petitioner and that some folks thought that petitioner was a drug dealer, Redden had nothing

to say on the subject of what the prosecutor might have been able to develop on cross.[19]

Also lacking a foundation in the record is the notion that Redden decided to base his sentencing phase

strategy on "lingering doubt" rather than mitigating evidence (save the two stipulations, and the testimony

of Deborah and Irene). I say this for two reasons. First, when examined at the evidentiary hearing on

petitioner's ineffective assistance of counsel claim, Redden did not say, or even imply, that he pursued the

"lingering doubt" strategy.[20] From all appearances, Redden had little idea as to what he would say to the jury

when he rose to make his opening statement. Second, the transcripts of Redden's opening statement and

closing argument—copies of which are attached to this opinion—do not reflect a "lingering doubt" strategy.

In fact, in his closing argument, Redden told the jury:

> You've made a finding of guilt. I can't argue against that because it's already made, but I say to you in all sincerity that it would be a tremendous mistake, in my judgment, for you to return a recommendation; that is, a verdict that would impose on this court the obligation to cause this man to be put to death considering every circumstance of this case.

---

[19]As the prosecutor conceded, petitioner had no "substantial" criminal record; thus, the prosecutor could not have cross-examined petitioner's mitigation witnesses about petitioner's past crimes. As far as we can tell from the record, Redden had no idea as to the identity of any witness(es) the prosecutor could have called to the stand to rebut the sort of mitigating evidence petitioner's habeas counsel were able to develop. Nor did the prosecutor reveal the identity of such witness(es). As for Redden's belief that the Piedmont law enforcement community was "hostile" toward petitioner, neither Redden nor the prosecutor have explained how this hostility would have been put to the mitigation witnesses on cross-examination. Moreover, I have been unable to conjure a question that the prosecutor could have put to a mitigation witness—such as, "Have you heard that the Piedmont law enforcement community is hostile toward petitioner?"—that would have survived a defense objection. Furthermore, neither Redden nor the prosecutor, who defended Redden's conduct at the evidentiary hearing, identified any testimony that could have been admitted under the Federal Rules of Evidence. The same is true with respect to the belief of some in the community that petitioner was trafficking drugs.

[20]The majority not only concludes, *as a factual matter,* that Redden delivered a "lingering doubt" argument as a matter of trial strategy, but goes on to *hold* that "we ... would not approve a district court's finding otherwise." *Ante* at n. 26. In other words, Redden's lingering doubt argument provides a bench mark for the lawyers and courts of this circuit in future cases; any argument appearing to fit hand-in-glove with Redden's argument will be considered, as a matter of law, to be a "lingering doubt" argument!

Instead of relying on "lingering doubt," Redden urged the jury to give due weight to the fact that petitioner had no substantial criminal record, the fact that Charles Ray Jarrell would not be receiving the death penalty, and the testimony of Deborah and Irene Chandler. Regarding the women's testimony, he said that he had not presented "the testimony ... for a tear-jerking purpose." It was presented "to show that there was a life here that has had a stability to it, that has had some quality to it." In other words, a reasonable fact finder could find that Redden himself thought mitigating circumstances existed, which the jury should have considered in deliberating on the sentence to recommend.

### III.

In summary, the district court made no findings of fact regarding Redden's performance in the sentencing phase of the trial; rather, it disposed of petitioner's ineffective assistance claim by concluding that Redden's performance, even if constitutionally inadequate, caused petitioner no prejudice. What the majority and Judge Barkett in her dissent have done is to step into the district court's shoes, find the historical facts underpinning petitioner's claim that Redden's performance fell short of constitutional minima, and decide the merits of the performance aspect of petitioner's ineffective assistance claim. I would eschew such fact finding at the appellate level. Rather, I would remand the case to the district court, whose habeas role is to find the facts underpinning a petitioner's claims, with instructions to enter findings of fact and conclusions of law concerning Redden's performance in the sentencing phase of petitioner's trial.

### *Opening Statement*

Please the Court, ladies and gentlemen. Of course, the issue or there has been put in issue the question of whether these aggravating factors exist by evidence sufficient to convince beyond a reasonable doubt that they do exist. The Court has told you I believe and will tell you again that the only aggravating factors that could be considered are those that have been identified to you and that will be identified to you, I'm sure, in his closing instructions.

Mitigating circumstances may include any of those mitigating circumstances that are identified by statute and may include also anything else, any other circumstance that any juror wants to consider in mitigation. And by mitigation, we simply mean as tending to indicate to you that you should not recommend a death penalty.

Of course, as the Court has stated to you, the word "recommend" is used here but it's more than that. In this respect, that if a jury recommends the death penalty, the Court has no discretion to change that or to make another sentence or penalty, but among the statutory mitigating factors that the Court will identify to you are two at least that are very important in this case.

One is—and this is in the statute for a jury to consider—that the defendant on trial has no, as the statute says, "substantial criminal record". And we expect that to be demonstrated very clearly in this hearing, that that is true of David Ronald Chandler.

Also, that another person or persons who participated in the killing of Marlin Shuler, which has been found, is not receiving and is not undertaken to receive the capital penalty. I think that's already been demonstrated by the evidence in this case that that certainly is true with reference to the man that killed Marlin Shuler, Charles Ray Jarrell, Sr. But it will be demonstrated conclusively to you again in the course of this hearing.

Yesterday after you had commenced your deliberations you manifested an interest in what was identified as Exhibit 45 of the government and that was a tape that you asked to be played and you were allowed to have in your hands to read along with the playing of the tape a document which had been identified as Exhibit 45-A, not in evidence but as an assist to you.

The importance of that tape and of that document for purposes of this hearing is this. I say that this hearing will establish without a doubt—again I think it's something already that has already been established, that the death of Marlin Shuler occurred on May 8, 1990, that the statement that your foreman's message referred to to the Court which was in writing as the Court instructed and you did it without knowledge of what

51

numbered exhibit you were talking about, but the statement in which you had an interest was capsulated in the foreman's message. And that was Exhibit 45. And you manifested an interest in a statement that says, in substance, I've got to kill somebody or words to that effect.

The evidence has reflected and will reflect again that that statement was not made until July 31, 1990, that it was made almost three months after the death of Marlin Shuler. It could not have been made with reference to Marlin Shuler unless the maker of the statement was unaware of the death of Marlin Shuler. But you found contrary to that by your finding already. And I ask you—we will ask you to consider the significance of that fact; that is, that Marlin Shuler was already deceased at that time.

There will be other evidence that we will offer briefly and at the conclusion of this hearing and of the further instructions of the Court we urge and feel very strongly that you will not recommend a death sentence under all the circumstances of this case which you have heard and can take into consideration to the extent that the Court has instructed you and what you will hear on this hearing.

*Closing Argument*

Please the Court, I think that for the purposes that you're here that part of Mr. Davis' argument goes outside the parameters of what is relevant to determining what penalty you recommend for David Ronald Chandler. But I'll respond to part of it anyway. He talked of the great preparation, he talked about Texas, he talked about many things, all of which he now attributes to David Ronald Chandler, which the evidence did not attribute to David Ronald Chandler. He sort of forgets Paul Watson when he talks about who was the person who over a long period of time was the planner, was the contact with Treacy, was the contact with Moncrief, all of this, forgets and I respond to it only to say, number one, I think it's outside the scope of what is relevant here but, number two, it forgets what the evidence in this case was.

And then he says to you that David Ronald Chandler says to Charles Ray Jarrell, Sr., got $500.00, kill him, kill him, kill him, keep on and keep on until you persuade that man to do that and wait a minute, if I misstate the evidence, you'll correct me and I hope you'll correct Mr. Davis because Charles Ray Jarrell

52

testified, as I recall, that on an occasion three or four months before May the 8th, David Ronald Chandler had made a statement to him which said, in substance, "This man is going to cause trouble, I'll give you $500.00 to kill him." And what did he say about the statement. He said, "I thought he was joking, always off the wall like that." And that that's the only time, the only time that was ever mentioned up until the 8th day of May of 1990 when he said he had a conversation with David Ronald Chandler which he stated two different ways in his prior testimony. One time no money was mentioned, according to him. The other time said I've still got the $500.00. Now, what does that show with reference to any planning, scheming, deliberation by David Ronald Chandler. If that conversation took place at all, if it took place at all, took place after a long lapse of time, after one conversation that the man said was unimportant in my mind. Now, if it took place, it was a thing that was not precipitated. His testimony was not that any nine millimeter pistol had been given to him for the purpose of killing Marlin Shuler, that he had that pistol. He said, in his truck, that he thought, as I recall his testimony, that David Ronald Chandler was going to pick it up. David Ronald Chandler was going to pick it up that morning when he came over and that the thirty-eight he had was his own weapon.

Well, then let's go on. What prompted Charles Ray Jarrell, Sr. in his actions. How much did anything that was said to him on that day by David Ronald Chandler impel him, motivate him to do what he did after twenty-three beers on that date, twenty-three beers before he shot the man. And his testimony, as I recall, was well, shot up all of the thirty-eight—I don't know how many rounds were left in the nine millimeter, didn't even know whether he had any or not. And he shot him. And, of course, when Mr. Davis states that he stated unequivocally well, you know, this man again can be tested by what he had said unequivocally on other occasions; that is, number one, that he didn't shoot this man; number two, he shot him, it was an accident and then he gets into the routine of the statements that he made when it became profitable for him to make them.

Well, here's one thing that is undisputed. There was Jarrell's family's malice toward Marlin Shuler. How is that demonstrated. No question about the fights that both sons, Charles Ray, Jr., Billy Joe had with

53

Shuler. Why. Because of, number one, his abuse of Donna Shuler, Charles Ray's half sister, abuse of her, his abuse of the family generally and his abuse of Donna's mother, Mrs. Johnson, for whom he had an abhorrious name.

Charles Ray Jarrell had plenty of malice, animosity, hostility toward Marlin Shuler not engendered by David Ronald Chandler. David Ronald Chandler didn't have a thing to do with Charles Ray Jarrell putting a pistol to the nose of this man and pulling the trigger intending to kill him and in November of 1989. So what happened. He said well, the Lord must not have intended for him to die that night. And the prosecutors would say to you yeah, but that was all over with, that was over and done with, that was just one moment called the argument that well, he was looking him in the face at that time. That's a different thing from shooting him in the back of the head or wherever he was shot on a different occasion. But I say you can't attribute to David Ronald Chandler the compelling force of what that man did on that occasion to the extent that a recommendation, in fact, a sentence to death be justified.

I submit to you that under all the circumstance of this case it would be cruel and unusual punishment, which our constitution even says should not be the subject of punishment in this country.

Now, certainly we would argue and we do argue that there are two very clear mitigating circumstances in this case. One is the absence of any substantial criminal record, as the statute says, "mitigating factors". Number six, the defendant did not have a significant prior criminal record. And that stipulation which is in evidence is proof without contradiction that that is the case.

Another is that another defendant or defendants equally culpable in the crime will not be punished by death. You can go further than that, not be punished at all, will not even be tried under an accusation of the murder of Marlin Shuler. Those two things. Well, what else mitigates.

Well, for one thing, the testimony of his mother and of his wife was not here for a tear-jerking purpose. It was here to show that there was a life here that has had a stability to it, that has had some quality to it and I think that is apparent when you looked at those two ladies, contrasted to the character or nature of

54

some of the people who testified in this case and it stands out in stark contrast and the fact that here is a family that had tremendous stability, here is a man who not to have lived around with this person, that person and the other. He's got three children, they are all by his wife. Here is a man who apparently has some skill of his hands who has worked in building his house and his parents' house, his brother's houses and they've worked with him and this springs off the 80-acre farm that his father had with his father, way back. They built a sawmill, they cut trees, they made lumber, they collected rocks, they built houses and lives demonstrating lives with some purpose as opposed to life worthless. So that that is a mitigating factor that I think that you have certainly not just the right but the obligation to consider.

This is a case, of course, that's extremely important. You've made a finding of guilt. I can't argue against that because it's already made, but I say to you in all sincerity that it would be a tremendous mistake, in my judgment, for you to return a recommendation; that is, a verdict that would impose on this court the obligation to cause this man to be put to death considering every circumstance of this case. You are going to be told that any such recommendation must be unanimous, that it has to be signed on, signed on judgment of each one of you. And I say to you that there has been a lot of innuendo—where he says, well, now, this guy named McFry who is not her, Burrows who is not here—I say to you that there is no evidence in this case that would justify any speculation on someone's part that hey, these people may be dead and he might have had something to do with it. If you indulge in that, you will have committed, in my judgment, an aggrievous wrong as far as the defendant is concerned.

I think it is the certainly the inclination of our law and the safeguards that even this statute attempts to wrap around the case and this defendant or any defendant so charged that the recommendation of a death penalty is not considered to be the normal act of a juror, certainly under circumstances of this case and particularly where, as here, no prior record. And then the man who did it after twenty-three beers not even prosecuted for that murder, has been indicted but that will be dismissed, that's the stipulation that's in

evidence. So we ask you to consider the relevant evidence and when you've done so, we feel that you will return a recommendation to the court that there be no death penalty imposed on David Ronald Chandler.

Thank you very much.

ANDERSON, Chief Judge, dissenting:

I agree with Judge Barkett that Chandler has satisfied the prejudice prong of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). I agree with Judge Tjoflat that the performance prong should be remanded to the district court. Because the district court found that the prejudice prong was not satisfied, it did not address the performance prong. As Judge Tjoflat correctly explains, the district judge who heard the evidence should make the fact findings and resolve the material facts which are in dispute. I agree with Judge Tjoflat that, in this case, an appropriate resolution of the performance prong cannot be made without such fact findings by the district court. Accordingly, I respectfully dissent.

BIRCH, Circuit Judge, dissenting:

I join in Judge Barkett's comprehensive, persuasive, and record-relevant dissent. Given the current and continuing concerns about the reliability and, hence, the viability of the death penalty, it is critical for the courts to set a standard of attorney performance which merits the public's confidence. In this case, the majority places the acceptable level of attorney assistance so low as to risk undermining the public's confidence in the criminal justice system. The result of this opinion may be to make David Ronald Chandler the first federal prisoner executed by the government of the United States in 37 years.[1]

Chandler is the first person to be sanctioned with the death penalty as enacted by Congress in 1988 under the Anti-Drug Abuse Act of 1988, 21 U.S.C. §§ 848(e) *et seq.* Therefore, it represents a unique opportunity for the federal courts to prescribe the minimum requirements for the Government's taking of a

---

[1]*See* Linda Greenhouse, *In Test of New U.S. Law, Death Sentence is Upheld,* N.Y. Times, June 22, 1999, at A22 (noting that last federal execution occurred in 1963).

life. Defense counsel's entire penalty phase effort, from the minute that he asked Deborah Chandler to find mitigation witnesses until the arguments concluded, consisted of less than 24 hours. Before we, as a civilized society, condemn a man to death, we should expect and require more of an advocate.

For all of the reasons that I set forth in the panel opinion in this case, *see Chandler v. United States,* 193 F.3d 1297 (11th Cir.1999), *reh'g en banc granted and opinion vacated,* Dec. 3, 1999, I continue, as I did then, to be convinced that the record in this case compels the conclusion that Chandler received ineffective assistance of counsel during his penalty phase, in violation of the Sixth Amendment guarantees as set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The Supreme Court's recent decision in *Williams v. Taylor,* --- U.S. ----, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), only strengthens my conviction that we should vacate Chandler's death sentence and remand for re-sentencing.

BARKETT, Circuit Judge, dissenting, in which BIRCH, Circuit Judge, joins:

The issue in this case is whether a lawyer who has competently performed in the guilt phase of a capital trial, but does nothing to investigate mitigating evidence, has provided constitutionally effective representation at the sentencing phase. The Supreme Court made clear in *Williams v. Taylor,* --- U.S. ----, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), decided on April 18, 2000, that he has not.

To the extent that the majority's opinion suggests that a defense lawyer has no obligation, independent of his preparation for the guilt phase, to conduct even the most minimal investigation into the existence of mitigating evidence in preparation for the penalty phase of a capital case, it is contrary to and misstates the specific dictates of the Supreme Court as well as this Circuit's precedent. To the extent that the majority's opinion suggests that L. Drew Redden, Chandler's attorney, conducted a reasonable investigation into the availability of mitigating evidence, or that he made a reasonable tactical choice not to investigate or present

57

mitigating evidence, it is in clear conflict with the record,[1] which belies the conclusion that Redden conducted any investigation or made any reasoned tactical decisions with respect to the penalty phase of Chandler's trial.

Although the majority devotes much of its opinion to facts relevant to Redden's professional qualifications and civic and bar activities as well as his competent representation in the guilt phase, these facts have nothing to do with the issue raised in this case. As to that issue, the majority glosses over the record evidence of Redden's complete lack of preparation for or effort in the crucial penalty phase. Moreover, rather than remanding the case to the district court judge, who is in the best position to assess testimony, to give him the opportunity to decide first whether Redden's performance was constitutionally adequate, the majority arrogates this task to itself and, based on speculation, wrongfully holds that Chandler's sixth amendment right to counsel was not violated and Redden's performance was constitutionally adequate.[2]

*I. Redden's performance at the sentencing phase was constitutionally ineffective.*

*A.*      *Redden does not dispute that he failed to investigate the availability of mitigating evidence.*

In *Williams v. Taylor,* the Supreme Court found ineffectiveness requiring a new sentencing hearing where counsel "did not begin to prepare for [the penalty] phase of the proceeding until a week before the trial." 120 S.Ct. at 1514. In this case, counsel was even more remiss, failing to think about the penalty phase until the night before the sentencing hearing.[3] The guilt-innocence proceeding ended at 2:30 on the afternoon

---

[1]Notwithstanding the majority's assertion, *supra* note 41, that the disagreements in this case are about the law and not about factual matters, I in fact do take issue with the majority's reading of the record as well as its interpretation of the law.

[2]This dissent is in a different format than the majority's 12 "principles and presumptions." I note that, while some of those principles and presumptions are accurate statements of the law, others are extrapolations from dicta that cannot be reconciled with the guidance provided in *Strickland.* Many, as pointed out *infra,* are totally inapplicable to the facts of this case.

[3]When asked what he did to prepare for sentencing, Redden admitted "I would say basically not anything explicitly. I mean, what I was preparing to do was to try to defend the case and there was not volunteered at that—in any of that among the people I talked with or presented to me anything that I considered would be helpful on a sentencing phase if that came to pass." R13-433-331.

At a later point, Redden again testified:

58

of April 2, 1991, and the penalty phase was set to begin at 9:00 the next morning. That afternoon, Redden "prepared" for the penalty phase by asking Deborah Chandler, the defendant's wife, to "find" some character witnesses to "stand up for Ronnie" the next morning.[4] In addressing the extent to which counsel must prepare for mitigation, our cases require that counsel, at the very least, inform the defendant and the defendant's

---

> Q. You testified earlier today that prior to trial, I think your exact words, you had done essentially nothing to prepare a mitigation case in the event that your client was convicted of the murder charge. Murder in furtherance of a continuing criminal enterprise. At the—during trial, what, if any, efforts did you do to try to put together a mitigation case?
>
> A. In connection with sentencing?
>
> Q. Mitigation case in connection with sentencing, yes, sir....
>
> A. Very little.

R13-433-359.

[4]Deborah Chandler testified that Redden first asked her to find character witnesses for the sentencing hearing on the afternoon that Chandler was convicted. *See* Exh.12 at 19. Redden explicitly corroborates Chandler's testimony on this point:

> Q. Did you go—when did you go prepare their testimony?
>
> A. We talked probably some that afternoon, I'm not sure, and probably the morning.
>
> Q. So it would have been after—sometime after 2:30 before you talked to her?
>
> A. It might have been, I don't recall now.
>
> Q. Okay. Or it would have been sometime before 9:00 a.m. in the morning?
>
> A. We started at nine and we talked to them that morning, it would have been before then.
>
> Q.... [H]ow much time did you have to prepare Ms. Irene Chandler and Ms. Deborah Chandler for their testimony?
>
> A. Not much.

R13-433-371-72.

59

relatives about the nature and importance of character evidence in a capital sentencing trial,[5] ask them for the names of potential witnesses,[6] and then follow up on whatever leads they provide.[7]

Even if it were appropriate for counsel to delegate the task of uncovering mitigating witnesses to a person without any legal training whose husband had just been convicted and faced the possibility of being sentenced to death the next day, Deborah Chandler hardly had time to comply. On that afternoon, she had to drive approximately two hours to Piedmont where she and Chandler lived, and two hours again the following morning to attend the penalty hearing. She thus had approximately twelve hours to round up mitigation witnesses who would then be called to testify with little or no preparation from trial counsel as Redden never advised Deborah Chandler, or anybody else, regarding the nature of the testimony he hoped

---

[5] *Tyler v. Kemp,* 755 F.2d 741, 744-45 (11th Cir.1985) (finding that, although counsel contacted relatives, his performance was deficient because he "did not tell them that their testimony was needed on any subject other than guilt or innocence and did not explain the sentencing phase of the trial of that evidence of a mitigating nature was needed"), *rev'd in part on other grounds sub nom. Peek v. Kemp,* 784 F.2d 1479, 1494 & n. 15 (11th Cir.1986) (en banc).

[6] *Elledge v. Dugger,* 823 F.2d 1439, 1445, *modified on other grounds,* 833 F.2d 250 (11th Cir.1987) (stating that counsel must "at least interrogate [the defendant's] relatives"); *see also Cargill v. Turpin,* 120 F.3d 1366, 1386 (11th Cir.1997) (finding effective assistance where counsel "obtained names" of potential witnesses from defendant and defendant's mother and sister); *Bolender v. Singletary,* 16 F.3d 1547, 1558 (11th Cir.1994) (counsel effective where he "interviewed relatives concerning [defendant's] family background"); *White v. Singletary,* 972 F.2d 1218, 1224-25 (11th Cir.1992) (counsel effective where he "spoke[ ] with family members in preparing for the penalty phase"); *cf. Stevens v. Zant,* 968 F.2d 1076, 1083-84 (11th Cir.1992) (counsel effective where he tried to secure in-court presence of defendant's relatives by telling defendant of importance of this, asking him for names, and speaking with the two relatives defendant mentioned).

[7] *Compare Jackson,* 42 F.3d at 1367 (deficient performance where counsel aware of some "possible" mitigating evidence regarding defendant's background but failed to investigate); *Blanco v. Singletary,* 943 F.2d at 1500-01 (11th Cir.1991) (deficient performance where counsel left messages with relatives mentioned by defendant but neglected to contact them); *Middleton v. Dugger,* 849 F.2d 491, 493 (11th Cir.1988) (deficient performance where counsel learned of mitigating personal history evidence from defendant but failed to investigate); *with Cunningham v. Zant,* 928 F.2d 1006, 1015-16 (11th Cir.1991) (not deficient performance for failing to locate more character witnesses where counsel interviewed the three people defendant identified as well as several others). *But cf. Singleton v. Thigpen,* 847 F.2d 668, 670 (11th Cir.1988) (counsel not deficient for failing to interview neighbors where he "asked [defendant's] mother and girlfriend to identify individuals who could testify on behalf of [defendant], but they could not name anyone" and where defendant failed to proffer evidence which counsel would have found had he searched neighborhood).

60

to elicit at the penalty stage. *See* R13-433-364. Redden did not consider or request a continuance in order to prepare for the next day's penalty phase. *Id.* at 324.

When asked whether he thought he would have had some opportunity to interview potential character witnesses, Redden responded: "Well, only a hope. And not one that I really spent a lot of time or effort on or felt that there was that much time to spend on." *Id.* at 398. The best he could do was suggest that he would have been prepared to listen if anyone had volunteered anything useful. When asked why he had not "done any specific preparation for the death penalty phase," *id.* at 395, Redden offered the following explanation:

> Well, I guess, number one, you do what's coming up first, and you do what's immediately on you. Number two, of course, if something happens in your interviewing of a witness or talking to a particular witness that could be of value ultimately in that, you'd make at least a mental note of that. But there wasn't, as I've testified, anything specifically directed to that at that time and nothing was volunteered to me that I considered of value in there.

Although the majority notes that Redden interviewed 67 witnesses, it is clear that those witnesses were interviewed only for purposes of the guilt phase of the trial and not for purposes of mitigation.[8] Moreover, the majority of these interviews were with government witnesses who were unlikely to offer unsolicited favorable character evidence. There is no evidence that Redden asked a single question of these witnesses with mitigation in mind.

---

[8]Q. Mr. Redden, on cross-examination you mentioned that there was some interviews of witnesses prior to trial and during trial, and though you don't have an independent recollection of how many were interviewed, you have been told by Ms. Brotherton that y'all have 67 files, witness files, with information regarding some contact with a witness; is that correct?

    A. I believe she said 67.

    Q. 67. And all of those witnesses, however, were witnesses that dealt with the guilt/innocence issues in the trial, is that not correct?

    A. Those were.

    Q. All 67 were guilt/innocence type witnesses.

    A. I would say that's correct.

R13-433-406.

The majority insinuates, extrapolating from Redden's use of the attorney-client privilege as to one issue, that Redden did not investigate because Chandler might not have wished him to do so. Although that suggestion is totally unsupported by the record in this case,[9] even if the majority's interpretation of the facts were correct, this Court has found that an attorney has a duty to investigate possible mitigating evidence *even* where a defendant has specifically said to his lawyer that he does not want to present any mitigating evidence. *Dobbs v. Turpin,* 142 F.3d 1383, 1387-88 (11th Cir.1998). "Although the decision whether to use mitigating evidence is for the client, this court has stated, 'the lawyer first must evaluate potential avenues and advise the client of those offering possible merit.' " *Id.* (quoting *Thompson v. Wainwright,* 787 F.2d 1447, 1451 (11th Cir.1986)); *see also Blanco,* 943 F.2d at 1503 (finding ineffective assistance where "[t]he ultimate decision that was reached not to call witnesses was not a result of investigation and evaluation, but was

---

[9]The majority speculates that Redden censored himself at the Section 2255 evidentiary hearing and that the district court shielded attorney-client conversations from examination. On the contrary, the court did nothing to prevent the prosecution from asking Redden whether he had discussed the existence or presentation of mitigating evidence with Chandler. Indeed, when the prosecution requested permission to ask Redden whether he had discussed certain topics with his client, the district court instructed Redden to testify as to the fact of the conversations but not to reveal what was said. R13-433-385. Far from halting such inquiries or even chilling prosecutors from asking questions along those lines, the court merely stated that it would make rulings on questions that might touch on the attorney-client privilege "on a situation by situation, case-by-case basis." *Id.* Clearly, the prosecution could have asked Redden whether he had ever had conversations with Chandler or his family members regarding possible mitigating evidence. When the prosecution did ask Redden whether he had failed to mention any preparation he had done for Chandler's case, he indicated that all of his preparation had been covered during direct examination:

> Q. A number of things that were described by [appellate counsel] Mr. Martin or you were questioned by Mr. Martin concerning a number of things that you did in preparation for this case. Were there any matters that, or any preparation that you did that was not covered on direct examination that you can think of that would be of significance or do you feel like you covered everything?

> A. I guess the nature of everything was covered. I don't suggest that each act of preparation was covered.

*Id.* at 386. The effect, if any, that invocation of the attorney-client privilege should have on review of counsel's effectiveness at the trial level is prematurely addressed and decided by the majority, as the issue was not briefed or argued in this case. Such an important question needs to be fully addressed prior to any decision by this Court.

instead primarily a result of counsels' eagerness to latch onto [the defendant's] statements that he did not want any witnesses called"). Again, Redden could not have intelligently counseled Chandler about the availability or presentation of mitigating evidence because he had no knowledge of its nature or its extent.

B.    *A lawyer has an obligation to investigate mitigating evidence.*

In *Williams v. Taylor,* the Supreme Court, citing to the American Bar Association's Standards for Criminal Justice, specifically stated that a defense lawyer in a capital case is "obligat[ed] to conduct a thorough investigation of the defendant's background." 120 S.Ct. at 1514-15. The ABA standard recognizes the lawyer's substantial role in raising mitigating factors both to the prosecutor initially and to the court at sentencing, that this task cannot be accomplished simply on the basis of broad general emotional appeals or on the strength of statements made to the lawyer by the defendant, and that investigation is essential to discover facts about the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like. It concludes that, "without careful preparation, the lawyer cannot fulfill the advocate's role." 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed.1980).

Dismissing *Williams* ' relevance to this case,[10] the majority says that "[i]nvestigation (even a nonexhaustive, preliminary investigation) is not required for counsel reasonably to decline to investigate a line of defense thoroughly." Not only is this statement contrary to *Williams* and to prior Supreme Court precedent, but the citations following this statement hold precisely the opposite, as recognized in the parentheticals for the cited cases. *Strickland v. Washington* states that counsel has a duty either to make a reasonable investigation or to make a reasonable decision that no investigation is necessary. 466 U.S. 668, 691, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Strickland* also states that counsel may make a "less than

---

[10]The majority treatment of *Williams* is at odds with the well-established judicial practice of drawing general principles from specific cases as the majority has done throughout its opinion. We certainly agree that *Williams* does not establish a *per se* rule that "a defense lawyer must present character witnesses at the sentencing phase or that a defense lawyer (no matter what his client may have informed or instructed him) must in every case investigate purely to see if character witnesses might exist who might be of help at the sentencing phase." *Supra* note 21. We do however read *Williams* as reinforcing the established rule that defense counsel's decision not to present mitigating evidence must be reasonable.

complete investigation" *if* "reasonable professional judgment supports the limitations on the investigation." *Id.* at 690-91, 104 S.Ct. 2052.[11] As evidenced by the cases cited herein, as well as those cited by the majority, it is axiomatic that counsel must perform at least a preliminary investigation before he or she is able to make an informed or "strategic" decision about whether or not to further pursue that investigation.

In *Williams,* the Supreme Court emphasized that, regardless of whether counsel's failure to conduct a thorough background investigation was sufficiently prejudicial to have affected the outcome of sentencing, it "clearly demonstrated that trial counsel did not fulfill their obligation." 120 S.Ct. at 1514-15. Likewise, this Court previously has recognized that a defense attorney has a duty "to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence." *Porter v. Singletary,* 14 F.3d 554, 557 (11th Cir.1986).

It is true that an attorney may, under some circumstances, make a strategic choice to curtail a particular investigation. But the Supreme Court has tied the reasonableness of such a choice to the amount of investigation backing that choice:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on

---

[11]Similarly, in *Williams v. Head,* this Court noted that a *strategic decision* can be reasonable even if not preceded by a *thorough* investigation. 185 F.3d 1223, 1236-37 (11th Cir.1999). As the majority points out, that Court also held that counsel need not "pursue every path until to bears fruit or until all hope withers." *Id.* However, that statement does not support the conclusion that counsel is not obligated to conduct *any investigation at all.* This Court has established that defense counsel has a duty to undertake *reasonable* investigations. Failure to conduct any investigation "because of the mistaken notion that mitigating evidence is inappropriate is indisputably below reasonable professional norms." *Dobbs,* 142 F.3d at 1388 (quoting *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir.1991)). Redden did not fail to present some of the available mitigating evidence; he failed to present any of it. He did not make a strategic decision not to "stack defenses"; he did not "winnow out" certain arguments, witnesses or evidence. Redden failed completely to investigate the availability of mitigating evidence and then presented no case for mitigation at all. He relied on Chandler's wife to locate mitigation witnesses at the eleventh hour, and his abbreviated examination of the two people who should have known Chandler the best, his wife and mother, was so deficient as to have been detrimental. *See* footnote 18, *infra,* addressing the prosecution's use of their testimony. No prior decision of this Court or the Supreme Court has held that such a performance is constitutionally effective.

64

investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

*Strickland,* 466 U.S. at 691, 104 S.Ct. 2052; *see also Dobbs,* 142 F.3d at 1387-88 (advising that "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments") (quoting *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052).[12] Thus, counsel's failure to conduct a thorough or complete investigation may be excused only where a preliminary investigation has reasonably informed counsel's determination that further investigation is not warranted. "[T]he mere incantation of 'strategy' does not insulate attorney behavior from review; an attorney must have chosen not to present mitigating evidence *after having investigated the defendant's background, and that choice must have been reasonable under the circumstances.*" *Stevens,* 968 F.2d at 1083 (emphasis added); *see also Horton,* 941 F.2d at 1462 ("[O]ur case law rejects the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them.").

In *Baxter v. Thomas,* we said that the first step in assessing a claim of failure to investigate mitigating evidence is to "determine[ ] whether a reasonable investigation should have uncovered the mitigating

---

[12]The majority suggests that experienced criminal trial lawyers are entitled to some heightened standard of deference. Although counsel's experience may be relevant in assessing, for example, how he viewed a particular strategy, it cannot carry over to excuse a case of incompetent performance, notwithstanding his capable representation in any other case, or even in the guilt phase of this one. The majority attempts to parlay the respect for the professional judgment of an experienced trial lawyer that we expressed in *Provenzano v. Singletary,* 148 F.3d 1327 (11th Cir.1998), into a general principle of enhanced deference. But in *Provenzano,* we stated only that "[o]ur strong reluctance to second guess *strategic decisions* is even greater where those decisions were made by experienced criminal defense counsel." *Id.* at 1332 (emphasis added). In this case, Redden made no strategic decision. Rather, he completely failed to investigate or to discover readily available mitigating evidence. Deference is due to Redden's "strategic decision" only if evidence indicates that he made one. The majority's reliance on *Burger v. Kemp,* 483 U.S. 776, 779-80, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987), is likewise misplaced. The *Burger* Court merely mentioned in reviewing the facts that the defense counsel at issue in that case had a good deal of trial experience. That passing reference was in no way connected to the Court's conclusion that that counsel's performance was not ineffective, and the Court did not opine, as the majority's citation of *Burger* implies, that a counsel's extensive trial experience entitles him to enhanced deference. This was not Reddent's first capital case. It was, however, his first since 1976, and his first with the new bifurcated guilt and penalty phases. *See* R13-316-17; R15-1-28.

65

evidence. If so, then a determination must be made whether the failure to put this evidence before the jury was a tactical choice by trial counsel." 45 F.3d 1501, 1513 (internal citations omitted) (quoting *Blanco,* 943 F.2d at 1500). Thus, we may not simply assume that Redden's failure to investigate was a strategic decision deserving of deference. We must determine whether the failure to investigate mitigating character evidence was an unreasonable omission or a reasonable strategic choice.

C.      *Redden's failure to investigate and present the available mitigating evidence did not result from a strategic decision.*

Notwithstanding a complete absence of evidence in the record that Redden knew of or considered the existence or nature of mitigating evidence, the majority assumes that he made a "strategic choice" not to investigate it.

### *1. Lingering doubt*

The majority first excuses Redden's failure to investigate by positing that he chose instead to "focus[ ] on obtaining an acquittal and then at sentencing on lingering doubt." That choice, says the majority, "was a reasonable one." The majority errs in several respects in reaching that conclusion. First, it is mere conjecture on the part of the majority that Redden "chose" to pursue a strategy of lingering doubt. This gloss, which the majority has superimposed on Redden's actions in hindsight, is again not supported by the record. Redden himself never suggested that he pursued any such strategy. Nor did the government suggest he had pursued such a strategy until after the issuance of the panel opinions. The sum total of the evidence on which the majority depends for its conclusion that Redden pursued a strategy of lingering doubt is his testimony at the Section 2255 evidentiary hearing that he "did not feel that a reasonable minded jury would impose the death penalty" on Chandler. That's it. Redden did nothing at the sentencing hearing to communicate to the jury that, because they harbored lingering doubts regarding Chandler's culpability, they should not recommend the death penalty.[13]

---

[13]The majority relies on *Tarver v. Hopper,* 169 F.3d 710 (11th Cir.1999), to support its contention that counsel may reasonably decide to pursue a strategy of lingering doubt to the exclusion of all other strategies

66

Second, even if we credit the majority's assertion that trial counsel, albeit clumsily, pursued a lingering doubt theory, it was unreasonable for him to limit his presentation to that approach without first investigating how fruitful additional mitigating strategies might be. As noted earlier, courts may not simply assume that a failure to investigate was a strategic decision deserving of great deference. Although it is beyond peradventure that a strategic decision implies knowledge of the options, the majority says:

> Trial counsel stated that he did not need to know what a witness would say to determine whether the witness would be compelling at mitigation. He stated that you assume what a piece of testimony might be and "assume the most favorable testimony that you might get and then form some judgment, not the most reliable judgment in the world, but some judgment about how compelling it might be." We [the majority] agree.

No court has ever found that merely imagining what a witness might say on the stand constitutes effective assistance of counsel when that is the sum total of a defense attorney's investigation into the existence of mitigating evidence in a capital case. "In order for counsel to make a professionally reasonable decision whether or not to present certain mitigating evidence ... that counsel must be informed of the available options." *Jackson v. Herring,* 42 F.3d 1350, 1367 (11th Cir.1995). "An attorney's decision to limit his investigation ... must 'flow from an informed judgment.' ... '[O]ur case law rejects the notion that a "strategic" decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them.' " *Baxter v. Thomas,* 45 F.3d 1501, 1514 (11th Cir.1995) (quoting *Harris v. Dugger,*

---

during the penalty phase of a capital case. That case, however, is not analogous. In *Tarver,* counsel let the jury in on his strategy of lingering doubt so they could apply it at sentencing:

> I would hope that the evidence presented both in the case-in-chief last week and anything that you have heard today might be sufficient to raise in your mind at least a shadow of a doubt about the defendant's guilt, and if that doubt exists in your mind, I would pray that you would resolve it in favor of the defendant.

169 F.3d at 715. In addition, Tarver's attorney called a polygraph examiner who had interviewed Tarver. The polygraph examiner testified at Tarver's sentencing hearing that Tarver did not lie when he said that he had not killed the victim in that case. *Id.* The jury heard no comparable appeals in this case. More importantly, in *Tarver,* counsel's unambiguous decision to pursue a lingering doubt strategy was an informed one. Unlike Redden, counsel in that case first "interviewed every witness Tarver thought would be helpful as mitigation witnesses, including Tarver's mother, grandmother, aunt, cousin, girlfriends, former employer, and members of the community." *Id.* at 714. Redden did nothing.

874 F.2d 756, 763 (11th Cir.), cert. denied, 493 U.S. 1011, 110 S.Ct. 573, 107 L.Ed.2d 568 (1989), and

*Horton,* 941 F.2d at 1462). Moreover, Redden simply could not have "imagined" the actual mitigation in this

case. He did not know Chandler, he did not know Chandler's community, and there is no basis for believing

that he would have imagined all the supporting factual evidence of Chandler's good deeds and good character

that was presented at the Section 2255 hearing.

Finally, the assumption that Redden "chose" to focus on lingering doubt to the exclusion of mitigating

evidence makes no sense because the mitigating evidence here does not conflict with a lingering doubt

argument. On the contrary, mitigating evidence of the kind available here would have enhanced such an

argument. The kind of available evidence regarding Chandler's good deeds and character (see section II.A,

infra) could only have enhanced the jury's doubts regarding Chandler's participation in the murder.

Factually, Redden did not make any "strategic decision." Legally, a lawyer who does absolutely

nothing to prepare for the penalty phase even if he adequately prepares for the guilt phase of the trial is

constitutionally ineffective.[14] The foregoing cases clearly establish that preparation for the guilt phase does

not in any way alleviate a lawyer's obligation to prepare for sentencing. No reasonable civil defense lawyer

---

[14]Notwithstanding the Supreme Court's pronouncement in *Williams* that looking for mitigating evidence a week before sentencing falls below the objective standard of reasonableness, the majority not only fails to find Redden's behavior wanting, but rather finds it appropriate:

> Moreover, the evidence of a request to the wife—at least, as strongly—shows the laudable fact that trial counsel, like most good trial lawyers, was flexible and opportunistic: he did not think character witnesses would be helpful or a good use of his time to pursue, but a reasonable lawyer would not foreclose himself altogether from considering some if they were presented to him. In fact, one such character witness was presented to trial counsel; counsel did not use him.

> Redden testified that he did not put Chandler's former minister on the stand because "I felt that in the absence of some number of witnesses that would not be a wise thing to do." R13-433-398-99. As Redden had not investigated, he did not know that, in fact, a large number of witnesses were available. He therefore was incapable of making an informed judgment. It is unclear why Redden would think that these character witnesses would not be helpful; nor does the record contain any testimony that Redden in fact rejected these witnesses. Indeed, the quantity and quality of the available mitigating evidence utterly undercuts the proposition that character witnesses would not have been helpful.

68

would argue that it would be justifiable to give no shrift, or short shrift, to preparation on damages because the case against liability was strong. Such an omission would be considered malpractice. A comparable omission certainly falls below objective standards of reasonableness where the risk of inadequate preparation is not just monetary damages but death.[15] Consequently, we have rejected the assertion that an attorney's "good faith expectation of a favorable verdict" somehow excused his failure to prepare for the penalty phase of a capital case. *Blake v. Kemp,* 758 F.2d 523, 535 (11th Cir.1985). In *Blake,* the Court concluded that counsel "made no preparations whatsoever for the penalty phase," *id.* at 533, notwithstanding the fact that counsel had interviewed the defendant's father several times and met with the father and mother together on one occasion before trial in order to learn of "character evidence which might be used for mitigation at a penalty proceeding," *id.* at 534. Moreover, if counsel believes that there is inadequate time to provide effective assistance, it is counsel's responsibility to seek a continuance from the trial court.[16]

---

[15]In finding ineffectiveness, this Court has previously condemned such a passive approach to gathering mitigation evidence. *See Blanco,* 943 F.2d at 1501-02 ("To save the difficult and time-consuming task of assembling mitigation witnesses until after the jury's verdict in the guilt phase almost insures that witnesses will not be available.").

[16]It is undisputed that Redden failed to seek a continuance at any point during Chandler's trial:

> Q. Given the circumstance that prior to trial you didn't have, I think your word was, you had done little or nothing regarding the penalty phase. Did you consider moving for a continuance?

> A. At what time?

> Q. Prior to trial?

> A. No, not in that, no.

R13-433-332.

> Nor did Redden ask for or consider asking for a continuance between the guilt and penalty phases of the trial. *Id.* at 324. He did, however, request a continuance to postpone commencement of the trail so he could attend a convention. "I had committed myself by word and by money to attend the Convention of the International Society of Barristers." *Id.* at 322. Redden felt that "the Court had set the agenda and that the court had, I'd say, acted to my client's benefit in requiring the other cases to be disposed of first and then had granted that extension. I didn't put my mind to thinking about asking for a further continuance or a further break at that time." *Id.* at 324.

69

*2. Possibility of harmful rebuttal*

The second after-the-fact justification suggested by the majority for Redden's "strategic decision" not to investigate or present mitigating evidence derives from Redden's "[m]isgivings about hurtful cross-examination and rebuttal witnesses." Again, we are left to speculate what negative cross-examination or rebuttal witnesses would have been available to counter the mitigating evidence that could have been presented in this case. Redden certainly had no knowledge of what that (hypothetical) cross-examination or those (imagined) rebuttal witnesses would reveal.[17] Indeed, he had no idea what his own potential mitigation witnesses might aver. Nor does the record indicate what that possible adverse evidence would have been. Chandler had *no* criminal record.

Unlike cases in which putting on good character evidence might have opened the door for the government to introduce evidence of prior convictions of which the jury had been unaware, *Darden v. Wainwright,* 477 U.S. 168, 186, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), or in which "cross-examination might ... have revealed matters of historical fact that would have harmed [the defendant's] chances for a life sentence," *Burger,* 483 U.S. at 792, 107 S.Ct. 3114, there is nothing in the record suggesting that the government possessed such lurking, damaging evidence against Chandler. In fact, it appears that the government had already managed to get that kind of evidence before the jury in the form of allegations that Chandler was responsible for the suspicious "disappearances" of two individuals, conduct for which Chandler was not charged.[18]

---

[17]The majority asserts that Redden did not need to articulate a reason for failing to present additional mitigation witnesses, because, in regard to potential cross-examination or rebuttal of those witnesses, "fear of the unknown may itself be reasonable." This statement flies in the fact of the Supreme Court's holding in *Williams* that defense counsel must investigate and discover the substance (and corollary risks) of such mitigation testimony *before* deciding whether or not to use it. *Williams,* 120 S.Ct. at 1514-15.

[18]Again, even if there was a risk that introducing mitigating character evidence would invite damaging rebuttal, Redden still had a duty to weigh both the value of the mitigating evidence and the force of the available rebuttal evidence in order to reasonably assess his choices.

70

The only "bad" rebuttal evidence that the government suggests might have been available in this case was Redden's testimony that he knew that some individuals in the Piedmont community "considered Ronald Chandler to be a drug dealer," and that "the law enforcement community in Piedmont ... was hostile to him." R13-433-399.  In light of the fact that Chandler had just been convicted of orchestrating a murder-for-hire in connection with his leadership role in a marijuana-growing enterprise, the fact that some people in the community deemed Chandler a drug dealer and that the police were antagonistic toward him could hardly come as a surprise to the jury during the penalty phase.  In any case, Redden's concerns regarding the possible consequences of presenting witnesses who would testify to Chandler's good character did not inform his decision not to present such witnesses.  He did not even know of the existence of these witnesses because he had never undertaken any investigation into the availability of mitigating evidence.  Redden also testified that, after balancing the favorable and unfavorable factors, the existence of potential for cross-examination on such matters "normally doesn't back you off putting on a character witness."  R13-433-415-16.  He also acknowledged that, other than his inarticulable fears, he had no reason not to pursue "the kindness aspect of Mr. Chandler's death penalty phase."  *Id.* at 400.

The Supreme Court in *Williams* is instructive on this issue as well.  There, the Court acknowledged that the presentation of that evidence would lead to the introduction of "evidence that was not favorable to" the defendant, including evidence that he "had been thrice committed to the juvenile system...."  *Williams,* 120 S.Ct. at 1514.  The Court found counsel in that case to be ineffective because "the failure to introduce the comparatively voluminous amount of evidence that did speak in Williams' favor was not justified by a tactical decision...."  *Id.* In this case, there is also no evidence that Redden made a tactical decision, and the record contains no indication that there was any rebuttal evidence unfavorable to Chandler.

### 3. *Purpose of mitigating evidence*

The majority's final post hoc rationalization for Redden's failure to present mitigating evidence appears to be that Redden "questioned whether evidence of [Chandler's] specific good acts would have been

71

compelling, considering that the Government was not arguing that [Chandler] was in all ways a bad man, but arguing that he had committed specific criminal acts." This surprising pronouncement contradicts every holding of the Supreme Court relating to the purpose of mitigating evidence. The purpose of mitigating evidence is precisely to show that the defendant is a good person.[19] *Lockett v. Ohio,* 438 U.S. 586, 602-06, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). "[T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record." *Id.* at 604, 98 S.Ct. 2954. The very task before a sentencing jury is to weigh the circumstances and severity of the crime committed against the goodness and qualities of the convicted defendant. At that stage of the trial "in capital cases the fundamental respect for humanity underlying the Eighth Amendment ... requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (internal citation omitted); *see also Williams,* 120 S.Ct. at 1516 ("Mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case."); *Penry v. Lynaugh,* 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (finding that the sentencer in capital case must "treat[ ] the defendant as a 'uniquely individual human bein[g]' and [make] a reliable determination that death is the appropriate sentence" (quoting *Woodson,* 428 U.S. at 304-05, 96 S.Ct. 2978)). "A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors

---

[19]Furthermore, examination of the government's closing argument demonstrates that the government did argue that Chandler was a bad man. "His presumption of innocence has been stripped away.... You are now allowed to look at the man himself." Ex. 15, R12-37-64. "Jack the Ripper had a mother. Charles Manson had a mother. That does not mean that ... the son is not guilty or is not deserving of the death penalty." *Id.* at 73-74. "He caused the misery. He lived off of other people's misery and their deaths." *Id.* "Marty Shuler's death was formulated by a single, diabolical mind of somebody who was possessed with the idea that marijuana and money was more important than life." *Id.*

stemming from the diverse frailties of humankind." *Woodson,* 428 U.S. at 303, 96 S.Ct. 2978; *see also*

*Pennsylvania ex rel Sullivan v. Ashe,* 302 U.S. 51, 55, 58 S.Ct. 59, 82 L.Ed. 43 (1937) ("For the determination

of sentences, justice generally requires consideration of more than the particular acts by which the crime was

committed and that there be taken into account the circumstances of the offense together with the character

and propensities of the offender."). By failing to present mitigating evidence during the penalty stage of

Chandler's trial, Redden denied Chandler his constitutional right to present to the jury evidence of his

character and record. In *Williams,* the Court said that "it is undisputed that Williams had a right—indeed, a

constitutional right—to provide the jury with the mitigating evidence that his trial counsel either failed to

discover or failed to offer." 120 S.Ct. at 1513. Ronnie Chandler is entitled to the same right in this case.

The Supreme Court has stated unequivocally that a defense lawyer in a capital case is "obligate[d]

to conduct a thorough investigation of the defendant's background." *Williams,* 120 S.Ct. at 1514-15. It

cannot be gainsaid that Redden's investigation of Chandler's background was nonexistent. Applying

*Williams,* we are bound to conclude that Redden's failure to undertake even the most preliminary investigation

into the availability of mitigating evidence, as well as his utter failure to present the available evidence, fell

below an objective standard of reasonableness. Moreover, the manner in which he presented the testimony

of the only two penalty phase mitigation witnesses, Chandler's mother and wife, was itself less than effective,

perhaps even harmful. The kinds of questions Redden asked and the brevity of his examination left the jury

with the impression that the two women who theoretically knew Chandler best had little or nothing to say

73

about him other than the fact that he liked to participate in building houses.[20]  Redden's performance in the

penalty phase was constitutionally ineffective.

II. *But for Redden's failure, there is a reasonable probability that the result of the penalty proceeding would have been different—a probability sufficient to undermine confidence in the sentence of death in this case.*

Just as *Williams* dictates a finding of ineffective assistance on the basis of Redden's performance, it

dictates a reversal on the basis of the prejudice Chandler suffered as a result of that deficient performance.

Indeed, this case provides a more compelling case for finding prejudice than did *Williams* as, even upon

conviction, Chandler was a much less likely candidate for the death penalty than was Terry Williams.

A.      *The available mitigating evidence for Chandler*

Had Redden investigated and presented the case to which Chandler was constitutionally entitled, he

would have given the jury the opportunity to know Chandler's character as his community knew it.  Habeas

counsel discovered in one afternoon at Chandler's church 40 witnesses who had specific knowledge and

examples of Chandler's good character traits, including compassion,[21] generosity,[22] love for children,[23] respect

---

[20]With the exception of a few initial, informational questions and answers, the entirety of Deborah Chandler's and Irene Chandler's testimony is reproduced in the now-vacated panel opinion, *Chandler v. United States,* 193 F.3d 1297, 1301-1302, nn. 6, 7 (11th Cir.1999), *reh'g en banc granted and opinion vacated,* Dec. 3, 1999.  The prosecution used the brevity of the testimony to his advantage.  "We didn't ask [either woman] one question because what they had to say, ladies and gentlemen ... was just that he's my child and he's my husband and here's his background.  I submit probably everyone of you have a husband or wife.  If not, you probably will.  Every one of you had a mother....  Jack the Ripper had a mother.  Charles Manson had a mother.  That does not mean that ... the son is not guilty or is not deserving of the death penalty."  Ex. 15, R12-37-74.

[21]See, for example, the testimony of Herbert McCord ("compassionate");  Ruby McFry ("a caring man"); Jerry Masters ("caring");  Marsha Dale Heath ("good-hearted," "giving");  Kenneth Ricky Chasteen ("He has a reputation for being an extremely caring person.");  Elaine Freeman ("He's one of the most compassionate, generous caring people I've ever met.");  Henry Lawler ("Good caring person");  Tina Stokes ("genuinely cared about people").

[22]See, for example, the testimony of Joseph Fortenberry ("generous");  Jerry Masters (same);  Elaine Freeman (same);  Joy McCoy ("He's a generous person.  He'd just give you the shirt off of his back, even if it was his last one.");  Sharon Robertson ("he's always been giving and generous.").

[23]See, for example, the testimony of Joseph Fortenberry (loved children);  Kenneth Ricky Chasteen ("fantastic" with children);  Rita Sue Smith (particularly caring for fatherless children);  Elaine Freeman ("like

74

for the elderly,[24] strong religious beliefs,[25] patriotism,[26] a strong work ethic,[27] and a non-violent disposition.[28] They also backed up their opinions with specific and telling examples of Chandler's behavior.

Chandler freely gave his time and support to a wide array of members of his community. Joseph Fortenberry, who had grown up with Chandler and had worked with him in construction, testified that

a second dad [to her children] after their dad passed away"); B. Russell ("very good role model [to children], encourag[ing] them to stay in school, to go to church"); C. Chandler ("loves children"); Kerry Chasteen (very good with children).

[24]See, for example, the testimony of Billy Russell (elderly residents of community "were very special to him .... he would treat them just like he was treating his own family"); Rita Sue Smith ("always had a compassion for the elderly people"); R.M. Trammell (age 82) ("always wanting to help me with something"; "[H]e's about the greatest friend I ever had."); Ruby McFry (age 75) ("always treated [her] with love and respect"); Ruth Trammell (Chandler's grandmother) (Chandler always visited once or twice a week to see if she needed anything).

[25]See, for example, the testimony of Kenneth Chasteen (Chandler would stop his car and pray for people); Don Matthews (Chandler is a religious person); Billy Russell (Chandler "very religious"); Sharon Robertson (same).

[26]See, for example, the testimony of Joseph Fortenberry ("He was real patriotic"); Kenneth Chasteen (Chandler sang "God Bless America" at the top of his voice from the peak of a mountain); Rita Sue Smith (Chandler a "very patriotic person," would pull his car over to the side of the road and sing "God Bless America").

[27]See, for example, the testimony of Joseph Fortenberry (Chandler was hard-working, "an excellent carpenter and an excellent brick layer, if not one of the best in the state"); Jerry Masters ("Ronnie will get up from daylight and work until dark and he wouldn't quit until the job is done."); Kenneth Chasteen ("[H]e's always been conscientious, hard worker."); Don Matthews (Chandler a hard worker, "one of the most skilled I've ever worked with"); Joy McCoy ("He's a very hard-working person"); Kenneth Charles Kelley (Chandler was hard working and "[h]e was a real good brick mason, and carpenter, too.") Ruth Trammell (hard working); Kenneth McCord ("Ronnie has always worked hard."); Hubert Masters ("he was a hard-working man").

[28]See, for example, the testimony of Joseph Fortenberry (not violent); Ruby McFry (same); Jerry Masters (not violent or hot-tempered); Kenneth Chasteen (not violent, never fought, never held grudges); Don Matthews (not violent); Rita Sue Smith (Chandler had paid up-front to have his house painted, but the painter had quit half-way through. Chandler had not gotten angry but had quoted the Bible: "Ronnie just said, well the Bible said if they take your coat to give him your cloak."); Kenneth Charles Kelley (never known him to be violent or hateful); Kenneth McCord (not violent, seemed easy-going); Billy Russell (remembered Chandler once getting angry at someone but Chandler later apologized: "It takes a lot to get him upset.") Deborah McFry (not violent); Sharon Kelley (same); Charles Thomas Chandler (same); Mary Dobbs (same).

Chandler's daily visits inspired him to walk after he had been told that his injuries in a traffic accident would prevent him from ever walking again. Rita Sue Smith, who estimated that she had known Chandler for 25 to 30 years, told of how Chandler and his wife had allowed Thomas Montgomery and his wife to stay with him while Montgomery was out of work. Chandler provided groceries for the couple and counseled Montgomery to confront his alcoholism and straighten out his life. Chandler transported Montgomery to and from Alcoholics Anonymous meetings. Montgomery confirmed all this and added that he had later sued Chandler due to an injury he had sustained while working for Chandler. They settled their differences and Chandler took him back as an employee because, Montgomery testified, although he would often miss work because of his alcoholism, Chandler never gave up on him and "always put [him] right back to work." Montgomery summarized his experience with Chandler by saying that "[h]e helped me more than anybody I know of."

Lesha McBrayer has known Chandler since around 1980. Like many others, she testified that Chandler and his wife had provided food and transportation for her family while her husband was out of work. When McBrayer's husband became abusive, the Chandler family would take her in. Chandler assured her that he and his family would support her decision, whether it was to stay with her husband or to leave him. As McBrayer testified, Chandler kept his word: "I had moved to Colorado. My husband had been in prison and he got out. And I had talked to Ronnie about it and Ronnie told me if I thought I could make it with him to go on up there, and that if it didn't work that he would try his best to get me home, and he did." When McBrayer's husband again became abusive, she contacted Debbie Chandler, and Chandler sent someone to get her. She testified that she would not have been able to return to Piedmont without Chandler's help.

Kenneth Ricky Chasteen, who testified that he had known Chandler "all his life," offered the following anecdote:

> I know Ronnie was a mason, a carpenter, and he know people that had lost their jobs before, when he found out about it, he would make sure they got some work. And I know one occasion personally

76

that he took money out of his own pocket and gave it to a guy that had just lost his job had three or four kids and I personally know that Ronnie didn't have the money to give away but he did any way.

Elaine Freeman, who has known Chandler since high school, testified that, when one of Chandler's neighbors lost a son in a car accident, "Ronnie took money and gave to them because they didn't have insurance to bury the boy and took money to them to help them bury him." Two other witnesses confirmed this anecdote and noted that, at the time this incident occurred, Chandler could ill afford to pay for the boy's burial. When Freeman's husband died, Chandler offered to let her "stay in [his] house as long as I wanted to. It was mine to do with and just as long as I always had a place to stay, not to worry about it." He never asked her to pay rent and would not accept payment when she offered. She also testified that when one of his workers needed a car, Chandler co-signed the loan and made all of the payments, never attempting to seize the vehicle and never uttering a harsh word. Billy Russell testified that Chandler had paid utility bills and rent for him when he was injured in a fire and could not work. Chandler visited Russell almost every day, making sure that he had food and that everything was alright. When Russell recovered enough to return to work, Chandler drove him there and back.

Fortenberry testified that Chandler had helped his family buy groceries: "I remember several occasions and he would bring vegetables by the house and leave them and I remember a time or two ... [when] Ronnie wouldn't hesitate to leave three or four, five dollars, whatever he had, there for to see the kids got their lunch." Chandler went out of his way to care for the people in his community. As Tina Stokes, who knew Chandler from school and church, testified, "I've known of him buying groceries for folks who he thought needed it ... [Once he] [s]topped on the way home from Georgia one night and he knew of some folks that needed some groceries and stopped in and bought a couple of bags of groceries." Henry Lawler testified that when he was out of work and his wife was pregnant, Chandler gave him a deer that he had killed. Ruby McFry, who had known Chandler since his father first brought him to church as a child, recalled that Chandler, without having been asked, had brought her groceries when she could not afford to buy any.

77

Marsha Dale Heath had known Chandler for approximately ten years, had met him at church, and knew his family. She testified about Chandler's generosity towards her son:

> [M]y son [Tony] didn't have any shoes and Ronnie was out at a neighbor's behind us and he saw Tony and he made a statement to Tony ... about [his] shoes and, Tony said I don't have any. It wasn't long after that the neighbors that was there that Ronnie was visiting that day brought Tony two pair of shoes, instead of one it was two.

Harbert McCord had known Chandler all of his life. He testified that Chandler would often buy a pair of cleats for people who needed them. According to Mary Dobbs, Chandler's wife's best friend, Chandler even bought new shoes for the pastor when he noticed that the pastor had holes in his shoes. He also said that Chandler routinely donated twenty-dollar bills for the local emergency rescue squad. Billy Russell, one of Chandler's neighbors and employees, confirmed that Chandler donated whatever he had in his pocket when asked for charity. He also told of how Chandler paid the utility bills for needy families and cut wood and hauled it to people who could not get any for themselves.

Many witnesses stressed Chandler's generosity, both in terms of donating his time and labor, and in terms of caring for his employees. Several witnesses testified that Chandler had helped to build a church fellowship hall and to renovate the parsonage without pay. Sharon Kelley, who had known Chandler for 27 years, described how he cut the grass of a friend of hers who was unable to do so himself due to a heart condition. Chandler's older brother, Charles, told of how Chandler had, without being asked, built a porch for a handicapped man so that he could get into his house more easily. Chandler asked nothing for his labor or the materials. Henry Lawler explained that Chandler had helped him to build his house, laying the foundation and doing the masonry work on the fireplace. Chandler built a barbeque grill for Hubert Masters. According to Sharon Kelley, "There was a time when we needed some work done on the house and we had the money for supplies but we didn't have money for labor. And Ronnie came and done the work for nothing just as a friend[ ] because we were friends." Sharon Robertson, Chandler's sister, told of how Chandler did brick work for her so that her house would be protected from the on-coming winter. "It was in the wintertime and it was very cold, but he worked in the cold to get it done. And I know it wasn't pleasant for him, but he

78

did it any way because our house needed to be bricked and out of the weather. And he didn't really expect to be paid for it either."

Fortenberry stressed Chandler's generosity towards his employees. As Fortenberry put it, "If there was somebody on [Chandler's construction] crew right there that was a working man and he came up there and tell him he didn't have dinner, money would buy his dinner with, Ronnie would see that that man ate if he worked." Don Matthews, who worked in Chandler's construction business, confirmed this from personal experience. "I was out of work and needed work real bad and Ronnie found out about it and hired me." Kerry Chasteen, who had known Chandler for over 25 years, testified that Chandler never turned away anyone who needed work. Marsha Dale Heath told of how Chandler, after hearing that Heath needed money, had suggested to his wife that they hire Heath to help clean their home, even though they did not really need the help.

Several witnesses testified that Chandler had a particularly kind way with children. Fortenberry testified that "[children] loved Ronnie. I mean, he'd play with them and, I mean, I'm not talking about five minutes. I mean he would spend 30, 45 minutes there just on the spur of the moment kind of playing. And you could tell he really enjoyed it." Jerry Masters had been Chandler's next-door neighbor for four years. He described his relationship with Chandler as follows: "Ronnie was a very caring person, a very giving person.... [M]y dad worked all his life, didn't have time to spend with us, so Ronnie kind of took us in and taught me the sport of hunting and fishing." Kenneth Chasteen added, "He was fantastic [with children]. He took his children and several other children that couldn't get out, take them riding, would introduce them to sports, shooting a bow, things of that nature." Kerry Chasteen described how Chandler had given all of the money in his wallet to a woman after overhearing her mention that she could not afford to buy Christmas presents for her children. Children appreciated Chandler's efforts. Wendy Twilley, who was only 14 years old when Chandler was arrested, testified that he was like a father to her.

79

Chandler also loved to share his knowledge with others. Jerry Masters testified that Chandler had taught him to hunt and to fish. He taught Joy McCoy's husband how to hunt deer. He also taught Masters' father-in-law how to do brick work and block work. "He was the type that would like to share what he knew." Kenneth Chasteen also noted that Chandler was always willing to teach people masonry and carpentry skills. Don Matthews also learned carpentry skills from Chandler, and he noted "[a]nd I'm not the only one that he's done that for."

B.       *This mitigating evidence compels reversal in accordance with <u>Williams v. Taylor</u>.*

David Ronald Chandler was convicted of offering $500 to Charles Ray Jarrell to kill Marlin Shuler. Although any murder is to be condemned, it is indisputable that Terry Williams was convicted of committing a much more heartless and heinous crime. He was found to have killed a drunken elderly man in his bed by beating him to death with a mattock after the man refused to lend him a couple of dollars. *Williams,* 120 S.Ct. at 1499-1500. He then went on a crime spree in which he savagely beat an elderly woman who was left in a "vegetative state" and was not expected to recover, set a fire outside a man's house before stabbing him during another robbery, and stole two cars. *Id.* at 1500. After his arrest, Williams set fire to the jail, for which he was convicted of arson, *id.,* and "confessed to having strong urges to choke other inmates and to break a fellow prisoner's jaw," *Williams v. Taylor,* 163 F.3d 860, 868 (4th Cir.1998). In contrast, it was never disputed that Chandler was not present when the victim died, and that the actual shooter and the victim were both intoxicated and engaged in target practice with firearms.

Moreover, as the majority points out with regard to Chandler, "the evidence of guilt was not overwhelming." There was a question as to whether Chandler was even involved in the murder. Jarrell, the man who actually shot Shuler, clearly had his own motivations for committing the murder—reasons wholly independent of any inducement Chandler may have provided. Shuler had abused Jarrell's sister and mother, Jarrell had attempted to murder Shuler on a previous occasion, and Jarrell consumed nearly a case of beer before shooting Shuler. Even if the jury believed that Chandler had seriously offered $500 to Jarrell to

80

murder Shuler, it could well have doubted that that offer had motivated Jarrell to kill Shuler. Indeed, Jarrell himself—the government's star witness as to the murder charge—had made numerous inconsistent statements regarding Chandler's role in the murder. In contrast, there was no doubt in *Williams* that the defendant confessed to having committed the crimes of which he was convicted.

There is also great contrast between the prior criminal histories of Chandler and Williams. Chandler had no prior criminal background and no history of incarceration. Williams, on the other hand, had an extensive criminal history and had been constantly incarcerated throughout his life. Furthermore, substantial evidence of Williams' criminal history and history of incarceration was presented to the jury at both the guilt and sentencing phases of his trial, as was expert testimony that "there was a 'high probability' that Williams would pose a serious continuing threat to society." 120 S.Ct. at 1500. Mitigating evidence offered on behalf of a defendant who has no prior criminal background is especially pertinent to the jury's determination of whether a defendant is sufficiently susceptible to rehabilitation such that a death sentence is unwarranted.

Finally, whereas the mitigating evidence for Williams could have opened the door to negative rebuttal evidence, the nature of Chandler's mitigating evidence made it significantly less susceptible to such an attack. Mitigating evidence can serve different purposes. In Williams' case, the mitigating evidence addressed the degree of his culpability for his confessed crime. It consisted of evidence that Williams had been committed at the age of 11, and that he had been the victim of "mistreatment, abuse, and neglect during his early childhood," and was "borderline mentally retarded." Evidence was also presented that he would not pose a future danger to society if kept in a structured environment. *Williams,* 120 S.Ct. at 1501. The mitigating evidence in this case addressed Chandler's good character as a person, consisting primarily of evidence of prior good acts which were unrebutted by the government. As the Court noted, "not all of the additional evidence was favorable to Williams," because it could not have been introduced without both revealing more of Williams' previous bad acts and reminding the jury of Williams' long history of prior criminal detention. *Id.* at 1514. Such is not the case with Chandler.

81

In light of all the foregoing, the district court erred in concluding that, notwithstanding the extraordinary testimony detailed above, Chandler had not been prejudiced by counsel's failure to elicit this testimony. The trial judge based this conclusion on three reasons, none of which are legally valid: (1) all of the witnesses showed a strong bias in favor of Chandler; (2) the good character evidence related to a time remote from that of Chandler's crimes; and (3) many of the witnesses were ignorant of Chandler's criminal activities and thus had no real insight into his character. None of these reasons is legally sufficient to support such a conclusion.[29]

First, if the fact that the mitigating character witnesses "showed a strong bias in favor of Chandler" was enough to "severely undercut the mitigating value" of the testimony of 40 such witnesses and to render their testimony "of tenuous value," then no mitigation witnesses would ever have a meaningful effect in any capital trial. All mitigation witnesses have a bias. By its very nature and definition, mitigating character evidence evinces a "bias" in favor of the defendant; this is particularly true of mitigating character evidence that might persuade a jury not to impose a death sentence.

The district court imagined that these witnesses "believed that drug dealing and violent crimes were irrelevant to a person's character," and therefore concluded that their testimony would be "of little moment to the jury." In fact, however, not a single witness expressed such a view.[30] Their purpose in offering character evidence was to try to persuade the jury that, in spite of the crimes he may have committed, Ronnie

[29]In addition, the district court's analysis of the prejudice issue is not as clear as the majority suggests. "[T]he Court acknowledges that the prejudice question in this case is a close one, and that reasonable people could disagree about whether Chandler was prejudiced." *United States v. Chandler,* 950 F.Supp. 1545, 1569 (N.D.Ala.1996).

[30]Although many witnesses said that their personal views of Chandler would not change even if the government's allegations were true, others either refused to believe the government's allegations or said that, if what the government alleged were true, their views of Chandler would change. See, for example, Marsha Dale Heath (asked if she would change her opinion, she replied, "I don't know. I don't—I haven't heard this, so I don't know."); Don Matthews (probably would change opinion); Joy McCoy (opinion might change: "I would still need to know the circumstances because I do not know a Ronnie Chandler like that."). The question was not posed to the last four witnesses, Sharon Robertson, Lesha McBrayer, Kerry Chasteen, and Thomas Montgomery.

Chandler did not deserve to be put to death. As noted earlier, the purpose of presenting mitigating evidence at the sentencing phase of a capital trial is to allow the jury to perform its constitutional function by considering "any aspect of a defendant's character or record." *Lockett,* 438 U.S. at 604, 98 S.Ct. 2954; *see also Collier,* 177 F.3d at 1201-02 ("Counsel presented no more than a hollow shell of the testimony necessary for a 'particularized consideration of relevant aspects of the character and record of [a] convicted defendant before the imposition upon him of a sentence of death.'") (quoting *Woodson,* 428 U.S. at 303, 96 S.Ct. 2978).

Second, the district court summarily dismissed and discounted the value of the mitigation witnesses because "this good character evidence related to a time period that was separated from Chandler's crimes" and was therefore "of little mitigating value." Although this Court previously has observed that in some circumstances character evidence relating to events remote in time from the conduct for which the defendant has been convicted may carry less weight when balanced against aggravating factors, *see Stanley v. Zant,* 697 F.2d 955, 969 (11th Cir.1983), the evidence at issue in this case was neither general nor temporally remote from the criminal conduct of which Chandler was convicted. Much of the testimony concerned personal interactions with Chandler that occurred within five years of the time that the government claims Chandler became a marijuana grower and dealer. Other witnesses testified that they continued to have contact with Chandler up until the time of his arrest.[31]

Finally, the trial court concluded that mitigation witnesses who "were unaware of Chandler's marijuana operation would have shown themselves to be ignorant of Chandler's character, so their testimony would have carried little or no mitigating weight." Again, this statement conflicts with all the case law requiring that a defendant have the opportunity to present mitigating evidence as to the type of person the defendant has shown himself to be through this actions and behavior. This required mitigating evidence does not go to a defendant's culpability for the crimes of which he was convicted. As has been repeated, the

---

[31]The witnesses who testified on Chandler's behalf often did not specify when the good acts had occurred. However, many witnesses testified that they remained in contact with Chandler up until his arrest and that his character was unchanged.

purpose of presenting character witnesses is to offer a complete view of the defendant, one that presents positive aspects of his humanity and individuality, so that the jury can weigh his good qualities against the nature of the crime committed to determine whether death is the appropriate sentence for this individual. Had Chandler been able to present the testimony that he introduced and sought to introduce at his Section 2255 evidentiary hearing, the jury would have been able to perform its constitutional function by giving a " 'reasoned moral response to the defendant's background, character, and crime,' " *Penry v. Lynaugh,* 492 U.S. 302, 327-28, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), (quoting *Franklin v. Lynaugh,* 487 U.S. 164, 184, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) (O'Connor, J., concurring in judgment), and *California v. Brown,* 479 U.S. 538, 545, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) (O'Connor, J., concurring)), and by considering "the character and record of the individual offender and the circumstances of the particular offense," *Woodson,* 428 U.S. at 304, 96 S.Ct. 2978. Given the quality and quantity of the evidence that was available at the time of trial, viewed against the backdrop of the statutory aggravating and mitigating factors the jury was required to consider,[32] there is a reasonable probability that, but for Redden's failure to present *any* of the available

_____

[32]In determining whether to impose life imprisonment or a death sentence, the jury must consider and weigh the balance or imbalance of statutory aggravating and mitigating factors. These factors form an important backdrop to our evaluation of whether the presentation of the omitted mitigating character evidence would have created a reasonable probability of a different result. In Chandler's case, there were three aggravating factors presented to the jury: 1) that Chandler intentionally engaged in conduct intending that Shuler be killed and resulting in Shuler's death, 21 U.S.C. § 848(n)(1)(C); 2) that he procured Shuler's killing by promising to pay something of pecuniary value, 21 U.S.C. § 848(n)(6); and 3) that he committed Shuler's murder after "substantial planning and premeditation," 21 U.S.C. § 848(n)(8). The jury rejected the "substantial planning and premeditation" factor, leaving only two aggravating factors against which to compare the two statutory mitigating factors introduced by stipulation: 1) that Chandler had no prior criminal record, 21 U.S.C. § 848(m)(6); and 2) that the actual killer, Jarrell, would not be punished by death, 21 U.S.C. § 848(m)(8). Redden's failure is all the more prejudicial in this case because the statutory aggravating and mitigating factors in this case were in essential equipoise.

84

mitigating evidence, Chandler would not have been sentenced to death.[33]  Accordingly, I find that Chandler

suffered prejudice as a consequence of Redden's ineffective assistance during the penalty phase.

CONCLUSION

The Supreme Court has recognized that the "qualitative difference between death and other penalties

calls for a greater degree of reliability when the death sentence is imposed."  *Lockett,* 438 U.S. at 604, 98

S.Ct. 2954.  In *Woodson,* a plurality of the United States Supreme Court concluded that "in capital cases the

fundamental respect for humanity underlying the Eighth Amendment ... requires consideration of the

character and record of the individual offender and the circumstances of the particular offense as a

constitutionally indispensable part of the process of inflicting the penalty of death."  *Id.* at 304, 96 S.Ct. 2978.

When a lawyer does absolutely nothing to investigate whether mitigating evidence exists, he cannot

be said to have made a strategic decision not to present that evidence.  When that evidence does exist and it

is reasonably probable that its presentation would have made a difference in the outcome, or conversely, that

its absence "undermines confidence in the outcome," 466 U.S. at 694, 104 S.Ct. 2052, that lawyer cannot be

said to have been "functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," *id.* at 687,

104 S.Ct. 2052.  This is such a case.  Accordingly, Ronald Chandler is constitutionally entitled to a new

sentencing hearing.

WILSON, Circuit Judge, dissenting:

---

[33]As noted *supra* in footnote 28, the district court considered the prejudice issue a close one.  "[T]he jury [must] unanimously recommend a death sentence, [otherwise,] the district court shall impose a sentence, other than death, authorized by law."  *United States v. Chandler,* 996 F.2d 1073, 1088 (11th Cir.1993).  Just one juror would have to be swayed by the mitigation evidence not presented in order for the death penalty to be eliminated as a sentencing option.

85

We held in *Tarver v. Hopper,* 169 F.3d 710, 715 (11th Cir.1999), that the creation of lingering doubt can be an effective strategy for avoiding the death penalty. But the choice to use this strategy must be made by defendant's counsel.[1]

It is evident from the record that Chandler's counsel made no strategic decision to use a "lingering" or "residual" doubt defense on Chandler's behalf. Not even the government suggested that he did so until after the dissent from the panel opinion in this case.[2] The majority opinion retroactively credits Chandler's lawyer with making a strategic decision that is not indicated by the record. As a result, today's decision virtually forecloses any future *Strickland* claim of ineffective assistance during the penalty phase of a capital proceeding. Because I believe the majority opinion extends *Tarver v. Hopper* too far, I respectfully dissent.

---

[1]If, as the record shows here, a lawyer simply fails "to investigate and to present substantial mitigating evidence to the sentencing jury," he falls below the objective standard of reasonableness required for effective representation. *Williams v. Taylor,* --- U.S. ----, 120 S.Ct. 1495, 1511, 146 L.Ed.2d 389 (2000).

[2]*See Chandler v. United States,* 193 F.3d 1297, 1311 (11th Cir.1999) (Edmondson, J., dissenting), *vacated,* No. 97-6365 (11th Cir. Dec. 3, 1999).